JUSTIN A. NELSON (TX SBN 24034766)*
jnelson@susmangodfrey.com
MATTHEW BEHNCKE (TX SBN 24069355)*
mbehncke@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
*pro hac vice forthcoming

KATHERINE M. PEASLEE (CA SBN 310298)
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
kpeaslee@susmangodfrey.com

AMANDA BONN (CA SBN 270891)
abonn@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

*Attorneys for Plaintiff Media Matters for America*
*(Additional parties and counsel listed with signature)*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, ANGELO CARUSONE, and ERIC HANANOKI | Case No. 3:25-cv-02397 |
| Plaintiffs, | **COMPLAINT** |
| vs. | |
| X CORP., TWITTER INTERNATIONAL UNLIMITED CO., and TWITTER ASIA PACIFIC PTE. LTD. | DEMAND FOR JURY TRIAL |
| Defendants. | |

COMPLAINT

## INTRODUCTION

1. Plaintiff Media Matters for America ("Media Matters") seeks to enforce its contractual right for *this Court* to hear the claims that X Corp. has brought against it in multiple jurisdictions around the world. X brought these suits as punishment for Media Matters' truthful reporting that ads appeared next to white-supremacist content on the X platform. Immediately after Media Matters published that reporting, Elon Musk—Chairman of X—proclaimed that his company was about to file a "thermonuclear" lawsuit against Media Matters in retaliation. And indeed it did. In fact, using the artifice of foreign affiliates, X filed three separate lawsuits around the world. But X did not honor its very own Terms of Service. X's Terms of Service governing the conduct at issue in X's lawsuits contain a mandatory forum selection clause requiring that "***All disputes related to these Terms or the Services will be brought solely in the federal or state courts located in San Francisco County, California, United States.***" None of the lawsuits X filed were filed in this county. Rather, X initiated a vendetta-driven campaign of libel tourism, spanning three jurisdictions in three countries, all arising from the same conduct: Media Matters' use of X's platform in accordance with X's Terms of Service and its truthful reporting on the results.

2. This proliferation of claims over a single course of conduct, in multiple jurisdictions, is abusive. It is consistent with Musk's promise to unleash a punitive "thermonuclear" response upon Plaintiffs for having dared to publish an article Musk did not like. It is also a breach of contract. X drafted its forum selection clause, yet refuses to abide by its terms in order to maximize harm. Plaintiffs bring this breach of contract claim to enforce their rights under that clause.

3. Media Matters is a Washington, D.C. based organization dedicated to monitoring, analyzing, and correcting misinformation in the U.S. media. Plaintiff Angelo Carusone serves as Media Matters' President and CEO. Plaintiff Eric Hananoki is a Senior Investigative Reporter for Media Matters and for the past decade has specialized in reporting on extremism—including white nationalism, antisemitism, and neo-Nazi rhetoric—in the public square. For years, Plaintiffs have regularly published material that is critical of powerful figures, politicians, and elected officials.

4. After Musk purchased the social media company Twitter—which he subsequently rebranded as "X"—in late 2022, the company's advertising revenue plummeted. Plaintiffs and other

media outlets published multiple articles on what was a major national news story: the disturbing rise of violent and extremist rhetoric on the platform after Elon Musk's takeover. Musk himself appeared to endorse extremist views and conspiracy theories, making a series of increasingly erratic and conspiracy-addled comments.

5.     Advertisers and users fled in droves. By October 2023, media outlets reported that X's ad revenue had dropped by 53% in the year after Musk purchased Twitter, while monthly users had dropped by 15%. In response, Musk lashed out—not against the violent and extremist rhetoric exploding on X, but against the organizations calling attention to these issues on the world's leading platform for real-time communication and agenda-setting.

6.     Musk has continually tried to blame others for this loss in revenue since his takeover. In July 2023, Musk filed suit in this District against the non-profit Center for Countering Digital Hate ("CCDH"), alleging that the Center "cherry-pick[ed] from the hundreds of millions of posts made each day on X and falsely claim[ed] it had statistical support showing the platform is overwhelmed with harmful content"; further alleging that X had suffered "at least tens of millions of dollars in harm" as a result of advertisers leaving; and citing the very same forum selection clause at issue in this case as justification for venue. *X Corp. v. Center for Countering Digital Hate*, No. 23-cv-03836 (N.D. Cal.) (Dkt 10, Amended Complaint at Paragraphs 1, 5, and 16). These allegations foreshadow those he would eventually level at Media Matters—another non-profit that dared to publish accurate but unflattering information about content on X. Judge Breyer dismissed X Corp.'s complaint against CCDH, stating that the case was "about punishing the Defendants for their speech." *X Corp. v. Ctr. for Countering Digital Hate, Inc*., 724 F. Supp. 3d 948, 955 (N.D. Cal. 2024). In September 2023, Musk threatened to sue the Anti-Defamation League ("ADL") for likewise supposedly causing a drop in advertising revenue when the ADL reported about the growing prevalence of hate speech on X.

7.     Recognizing advertisers' concerns that they did not want their ads to appear next to extremist rhetoric, X attempted to undertake steps that supposedly would allow advertisers to control where their ads appeared. In August 2023, X announced a partnership with Integral Ad Science that would provide advertisers with greater control. In the press release announcing the

partnership, the CEO of Integral Ad Science declared that with this new technology, "marketers can ensure their campaigns prioritize only quality inventory that is brand safe and suitable."[1] The CEO of X, Linda Yaccarino, stated: "At X, balancing free expression and platform safety is our number one priority—and we are proving these two things are not at odds." She further claimed that "[g]rowing our partnership with IAS offers brands a new level of protection and transparency as they continue to grow on X."[2]

8.    As Media Matters and other outlets soon reported, however, these advertising controls were not functioning effectively. Hananoki published a series of articles for Media Matters specifically about X's apparent inability to protect its advertisers from appearing alongside extremist content, despite X's repeated promises that it would do just that. This series included an article published on November 16, 2023, when Musk was facing media backlash resulting from his apparent endorsement on X of a fringe conspiracy theory that postulates that Jewish people have a "hatred against whites" and support "flooding the[] country" with "hordes of minorities."[3]

9.    In the November 16 article, Hananoki reported that at the same time Musk appeared to endorse this antisemitic conspiracy theory, X was permitting the placement of advertisements next to pro-Nazi or other extremist content. The article published several examples, such as this image of an advertisement for Oracle appearing next to an image of Adolf Hitler:



---

[1] Press Release, *IAS Announces Exclusive, First to Market Partnership with X to Provide Pre-Bid Brand Safety and Suitability* (Aug. 8, 2023), https://investors.integralads.com/news-releases/news-release-details/ias-announces-exclusive-first-market-partnership-x-provide-pre.

[2] *Id.*

[3] @elonmusk, X.com (Nov. 15, 2023 12:49 PM), https://x.com/elonmusk/status/1724908287471272299.

COMPLAINT - 3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

10.     Rather than acknowledge that his own conduct and his decision to allow extremist content to run rampant on X was driving advertisers away (and revenue down), Musk continued to blame others.  He turned his sights to Media Matters.

11.     On November 18, 2023, Musk threatened "a thermonuclear lawsuit against Media Matters" in response to the November 16 article.[4] Musk's post embeds a list of purported "facts" about Media Matters' use of the X Platform, claiming that Media Matters used X in a "contrived" way in an effort to generate anomalous content/advertisement pairings. *Id*. Musk did not, however, deny that the pairings featured in the article actually occurred. In other words, it did not—and still does not—deny the report's truth.

12.     Nevertheless, as promised, Musk's company X Corp. filed a lawsuit in federal court against Media Matters and Hananoki on November 20, 2023, later amending to add Carusone. X Corp. filed in the Northern District of Texas, despite no connection between the case and that district. X Corp. is a Nevada company that was, at the time, headquartered in San Francisco, California. Media Matters and Hananoki are residents of D.C. and Maryland. Hananoki did not do any research in or otherwise travel to Texas for his article, he did not speak to anyone in Texas in the process of preparing the article, and Texas is not referenced in the article. X Corp.'s decision to file there was nothing more than an additional element of harassment in an already abusive and punitive lawsuit. It was also a violation of the X Terms of Service operative at that time, which require that the lawsuit be filed in San Francisco County, California.

13.     While this first suit was harassment enough—and has cost Media Matters millions of dollars to defend—it was only the start of Musk's globetrotting litigation campaign against Media Matters. When an X user posted, "X Corp. has filed a lawsuit against Media Matters," Musk responded, "The first of many." [5]

---

[4] *See* @elonmusk, X.com (Nov. 18, 2023, 2:01 AM), https://perma.cc/X4HN-PLJ4.

[5]     @elonmusk,    X.com    (Nov.    20,    2023    4:28    PM), https://x.com/elonmusk/status/1726759570754670667.

COMPLAINT - 4



14.     True to his word, in the weeks and months following the Texas suit, X filed copycat suits in Ireland and Singapore through its subsidiaries Twitter International Unlimited Company and Twitter Asia Pacific Pte. Ltd., respectively, as part of a global campaign of intimidation. Those suits allege the exact same conduct as the Texas suit and, like that suit, could only properly have been brought in California. Media Matters has consistently contested venue and personal jurisdiction in all three of X's filed cases.

15.     Musk has reiterated that these suits are part of his personal campaign against Media Matters. As he stated at an X Townhall,

> Media Matters is an evil propaganda machine. . . . **We are suing them in every country that they operate**. And we will pursue not just the organization, but anyone funding that organization. I want to be clear about that. Anyone funding that

organization, we will pursue them. So Media Matters is an evil propaganda machine. They can go to hell. I hope they do.[6]

Of course, Media Matters only "operate[s]" out of Washington, D.C.—making this worldwide campaign, and the need for Media Matters to defend itself in countries where it has no presence at all, all the more oppressive and harassing.

16.    Media Matters has been forced to defend itself in three different venues, none of them proper—and has spent millions of dollars doing so.  In view of X's multi-pronged attack on Media Matters in retribution for Plaintiffs' truthful reporting on their findings following legitimate use of the X Platform, Plaintiffs seek declaratory and injunctive relief from this Court, as well as damages for the injury they have suffered as a consequence of Defendants' breach of contract. Plaintiffs intend to very shortly seek a preliminary injunction enjoining further prosecution of the X Entities' pending litigation against Media Matters in Ireland and Singapore.[7]

17.    Democracy depends on free speech that holds the powerful accountable. X's worldwide campaign of intimidation seeks to punish Media Matters for exercising its core First Amendment rights on a matter of public importance. This Court should stop X's antics and enforce the forum selection clause that X itself drafted.

**PARTIES**

18.    Plaintiff Media Matters for America ("Media Matters") is a not-for-profit research center and media watchdog dedicated to comprehensively monitoring, analyzing, and correcting misinformation in the media. Media Matters routinely investigates political extremism on media platforms in the United States and publishes articles and commentary on public figures who endorse or espouse such rhetoric. It has been incorporated under the laws of, and has had its principal place of business in, the District of Columbia since its founding over twenty years ago.

---

[6] Lindsay Kornick, "Elon Musk calls Media Matters 'evil propaganda machine' ahead of lawsuit," FOXBusiness (December 10, 2023), https://www.foxbusiness.com/media/elon-musk-calls-media-matters-evil-propaganda-machine-lawsuit.

[7] Plaintiffs do not now seek such relief with regard to X Corp.'s prosecution of its pending Texas litigation. Rather, Plaintiffs have a pending motion to transfer venue in that court pursuant to 28 U.S.C. § 1404 and § 1406—based, in part, on the forum selection clause at issue in this case.

COMPLAINT - 6

19.    Plaintiff Angelo Carusone is the CEO and President of Media Matters. Carusone resides in Washington, D.C.

20.    Plaintiff Eric Hananoki is a Senior Investigative Reporter at Media Matters. Hananoki resides in Maryland, just outside of Washington, D.C. Hananoki generally researched and wrote his articles, including the November 16 article, from his residence in Maryland.

21.    Defendant X Corp. is a Nevada corporation currently headquartered in Bastrop, Texas. At the time of the events giving rise to this complaint, X Corp. was headquartered in San Francisco, California, where it took the actions giving rise to Plaintiffs' breach of contract claim. A large number of X employees and executives continue to be located in the Northern District of California.[8]  X Corp. owns and operates the social media platform "X."  Elon Musk is chairman of X Corp.

22.    Defendant Twitter International Unlimited Company ("TIUC") is an Irish company with a registered address in Dublin, Ireland. It is a subsidiary of X Corp. TIUC claims to operate the X Platform, which is owned by X Corp., in the European Union, United Kingdom, and European Free Trade Association ("EFTA") states. Ex. B ¶20.

23.    Defendant Twitter Asia Pacific Pte. Ltd. ("TAP") is a company incorporated in Singapore with a registered address in Singapore. TAP is a subsidiary of X Corp. and is the representative of X in the Asia Pacific region.

## JURISDICTION

24.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1) and § 1332(a)(2) because it is a civil action between citizens of different states and of foreign states, and the amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiffs seek damages in the amount of their attorneys' fees and costs for defending against Defendants' improperly filed litigation, which amount is in the millions of dollars.[9] Furthermore,

---

[8] Kurt Wagner, "Elon Musk's X to close San Francisco office, relocate workers," Bloomberg (Aug. 6, 2024), https://www.mercurynews.com/2024/08/06/musks-x-to-close-san-francisco-office-relocate-workers/.

[9] The Terms of Service contain a damages cap that purports to limit a user's damages to $100. However, this limitation, which restricts a user to $100 dollars with no potential for a remedy that would make them whole but which allows X to sue a user for millions (as it has done in this

Defendants' pending international lawsuits, as to which Media Matters intends to promptly move for an anti-suit injunction, seek at least tens of millions of dollars from Media Matters, placing that amount in controversy as well. *Cisco Sys., Inc. v. GTEC*, No. 10-CV-04960-EJD, 2011 WL 13253336, at *2 (N.D. Cal. Sept. 27, 2011). This Court has authority to grant Plaintiffs declaratory, injunctive, and other relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the Court's own legal and equitable powers. It also has supplemental jurisdiction over any state law claims derived from a common nucleus of operative fact. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349 (1988); 28 U.S.C. § 1367.

25.     This Court has personal jurisdiction over X Corp. because the Terms of Service at issue in this case ("TOS"), to which X Corp. is a party, provide for litigation in this District. *Chan v. Soc'y Expeditions, Inc.*, 39 F.3d 1398, 1406 (9th Cir. 1994). Attached hereto as Exhibit A is a true and correct copy of the TOS in effect at the time X filed its litigation against Media Matters. Furthermore, at the time of the conduct at issue in this case, X Corp. was headquartered in this District in San Francisco, California. Indeed, X has admitted in judicial pleadings that San Francisco is where X created, hosted, and maintained its platform that forms the basis of X's claims. *See* Twitter Motion to Dismiss or Transfer, *Doshier v. Twitter*, No. 4:18-cv-700-KGB (E.D. Ark. Sept. 28, 2018) ("X Doshier Motion"), ECF 4 at 2–3 & ECF 4-5 ¶3. X also admitted that it created and maintained its advertising platforms in California. *Id.* Similarly, X has admitted that both its user and advertiser agreements were drafted and updated by employees in California. *Id*. And, upon information and belief, the decision to file litigation in Texas and to direct the filings in foreign jurisdictions was made in California.

26.     This Court has personal jurisdiction over each of Twitter International Unlimited Co. and Twitter Asia Pacific Pte. Ltd. because they are third party beneficiaries of the TOS at issue in this case and are bound by its forum selection clause providing for litigation in this district. *TAAG Linhas Aereas de Angola v. Transamerica Airlines, Inc*., 915 F.2d 1351, 1354 (9th Cir. 1990). Personal jurisdiction over TIUC and TAP is additionally appropriate because they are bound by the

---

case), is unconscionable and unenforceable. This discrete limitation is properly severed in accordance with the agreement's severance provision.

1

2

forum selection clause contained in the TOS as parties that are "closely related to the contractual relationship." *Manetti–Farrow, Inc. v. Gucci Am., Inc*., 858 F.2d 509, 514 n. 5 (9th Cir. 1988).

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

27.    The Court also has personal jurisdiction over TIUC and TAP because they are alter egos of X Corp. TIUC, TAP, and X. Corp. share a unity of ownership and interest: Each of TIUC and TAP are subsidiaries of X Corp., which is turn part of X Holdings. Elon Musk is chairman of X Corp. and majority owner of X Holdings. Upon information and belief, based on Twitter's public financial reporting prior to Musk's taking the company private in 2022, TIUC and TAP's profits and losses roll up to X Corp. Twitter U.S.'s previous SEC filings account for earnings made by its foreign subsidiaries (including Twitter Asia Pacific Pte. Ltd., Twitter UK, and Twitter International Unlimited Co.). Those filings show that cash holdings of the parent include cash held by foreign subsidiaries. Furthermore, both TIUC and TAP have asserted in their respective foreign proceedings against Media Matters that they are synonymous with X and that they represent the X Platform owned and maintained by X Corp. in their respective regions. Ex. B (TIUC Complaint) at ¶¶20–21; Ex. C (TAP Complaint) at ¶¶12–13. According to TIUC and TAP, any reporting that defames the "X Platform"—which is owned and operated in the U.S. by X Corp.—necessarily defames <u>them</u>. Ex. B, ¶¶20–21; Ex. C, ¶¶12–15.  TIUC and TAP assert claims for "defamation," despite the fact that the November 16 article never mentions either entity. Their claims rely on the notion that the identities of "TIUC" and "TAP" are completely interchangeable with that of "X."

19

20

21

22

23

24

25

28.    The evidence further supports treating TIUC and TAP as alter egos of X Corp. because, upon information and belief, TIUC and TAP filed their actions against Media Matters under the direction and control of X Corp. Musk himself announced as much: when a user on X posted on November 20, 2023, that "X Corp. has filed a lawsuit against Media Matters," Musk responded, "The first of many."[10] Just a few weeks later, as part of an X Townhall, Musk said, "***We are suing them in every country that they operate***. And we will pursue not just the organization, but anyone funding that organization. I want to be clear about that. Anyone funding that

26

27

28

---

[10]    @elonmusk,    X.com    (Nov.    20,    2023    4:28    PM), https://x.com/elonmusk/status/1726759570754670667.

organization, we will pursue them."[11] Musk's announcement that X Corp.'s lawsuit in Texas was "[t]he first of many" and his subsequent admission that "we" are suing Media Matters worldwide—and may file more suits against both Media Matters and its donors—demonstrates that the lawsuits nominally filed by TAP and TIUC are in fact suits on behalf of Musk and X Corp. Musk's promise of worldwide litigation came just three days after TIUC served a summons on Media Matters in its Ireland litigation; three days after TAP sent a demand letter threatening to sue Media Matters in Singapore; and nine days before Twitter UK sent a demand letter similarly threatening suit.

29.    Treating TIUC and TAP as alter egos of X Corp. is consistent with public evidence demonstrating Elon Musk's total and direct control over both X Corp. and its foreign subsidiaries. For instance, Musk reportedly directed the dramatic changes in staffing and content moderation that followed his 2022 takeover of the company formerly known as Twitter.[12] Musk personally sent an email to all staff telling them they would need to either commit to his "extremely hardcore" vision for the company or be laid off.[13] Musk has reportedly involved himself in individual decisions about which specific accounts to allow or suspend,[14] as well as operational details such as how public media accounts should be labeled.[15] Musk's direction is not limited to the domestic X Corp. entity, but reportedly also includes X Corp.'s foreign subsidiaries: Musk's email informing workers that they could either accept a new "hardcore" culture or be fired went not only to U.S. employees of X Corp., but to employees of TIUC—and, upon information and belief, TAP

---

[11] Lindsay Kornick, FOXBusiness, "Elon Musk calls Media Matters 'evil propaganda machine' ahead of lawsuit," (December 10, 2023), https://www.foxbusiness.com/media/elon-musk-calls-media-matters-evil-propaganda-machine-lawsuit (emphasis added).

[12] *See, e.g.*, Michelle Toh, "Elon Musk says he's cut about 80% of Twitter's staff," CNN (April 12, 2023), https://www.cnn.com/2023/04/12/tech/elon-musk-bbc-interview-twitter-intl-hnk/index.html.

[13] Pete Syme, "Elon Musk sent a midnight email telling Twitter staff to commit to an 'extremely hardcore' work schedule — or get laid off with 3 months' severance," Business Insider (November 16, 2022), https://www.businessinsider.com/elon-musk-twitter-staff-commit-extremely-hardcore-work-laid-off-2022-11.

[14] Nikki McCann Ramirez, "Elon 'Free Speech' Musk Un-Suspends Accounts of Journalists Who Criticized Him," Rolling Stone (Dec. 17, 2022), https://www.rollingstone.com/music/music-news/elon-musk-twitter-journalists-banned-1234648351/.

[15] Mike Wendling, "Musk on hate speech, Twitter lay-offs and sleeping in the office," BBC (April 12, 2023), https://www.bbc.co.uk/news/live/world-us-canada-65247272?page=2.

employees—as well.[16] *Business Insider* reported that "Musk is closing many international Twitter offices as he continues to cut costs and try find ways the company can make money."[17] According to a Reuters report, the Musk-directed cuts included workers in Twitter's Dublin and Singapore offices—that is, TIUC and TAP, respectively.[18]

## DIVISIONAL ASSIGNMENT

30.     Pursuant to Local Rule 3-2(c), this case is properly assigned to the San Francisco Division because the TOS between the parties provide that "All disputes related" to those Terms or the services provided by X Corp. "will be brought solely in the federal or state courts located in San Francisco County, California, United States." This case is also properly assigned to the San Francisco Division because it arises from conduct that occurred in San Francisco County. X Corp. drafted and updated the relevant TOS from its headquarters in San Francisco County and, upon information and belief, X Corp.'s decision to file litigation in violation of those TOS and to direct its foreign subsidiaries to do likewise was made at its headquarters in San Francisco.

## VENUE

31.     Venue is proper in this district because the TOS between the parties provide that "All disputes" related to those Terms or the services provided by X Corp. "will be brought solely in the federal or state courts located in San Francisco County, California, United States." Venue is also proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claim occurred in this District.

---

[16] Rob Davies and Gordan Deegan, "Ex-Twitter worker wins £470,000 for unfair dismissal over Musk 'hardcore' email," The Guardian (Aug. 13, 2024), https://www.theguardian.com/technology/article/2024/aug/13/musk-ordered-to-pay-x-employee-470000-for-unfair-dismissal.

[17] Kali Hays, "Twitter is closing or getting kicked out of many international offices as Elon Musk skips rent and dramatically shrinks operations," Business Insider (Jan. 11, 2023), https://www.businessinsider.com/elon-musk-twitter-layoffs-closing-international-offices-singapore-europe-2023-1.

[18] Reuters, "Twitter Cuts More Staff Overseeing Global Content Moderation," (Jan. 7, 2023), https://www.reuters.com/technology/twitter-further-cuts-staff-overseeing-global-content-moderation-bloomberg-news-2023-01-07/; *See also* Aaron Drapkin, "Musk Fires Twitter Staff Policing Hate Speech and Misinformation," Tech.co (Jan. 9, 2023), https://tech.co/news/musk-fires-misinformation-team (reporting on firing of Dublin and Singapore employees).

**FACTUAL ALLEGATIONS**

**I.    Plaintiffs' research and reporting**

32.    Since its founding in 2004, Media Matters has been dedicated to monitoring and correcting misinformation, including by publishing its own investigatory research and reporting on its website.

33.    Angelo Carusone is Chairman and President of Media Matters. Carusone frequently provides opinions about extremism, online toxicity, and the underlying structures fueling their rise. He is also a resource for journalists writing about disinformation and the ways technology platforms are addressing the issue. Carusone regularly speaks on brand safety in advertising.

34.    Hananoki has worked at Media Matters since 2007 and is currently a Senior Investigative Reporter. Previously, Hananoki worked as a Researcher, Senior Researcher, Research Fellow, and Investigative Reporter at Media Matters. In his more than 17 years at the organization, Hananoki has researched and written countless reports and articles, including on public figures who espouse violent, extreme, or racist views.

35.    As part of his work at Media Matters, Hananoki has been reporting on X/Twitter for years. His coverage of X increased in 2023 due to a marked increase in extremist rhetoric on the platform after Musk took ownership, a disturbing trend widely reported on in the media, including by outlets other than Media Matters.

**II.    Elon Musk purchases X and slashes its content-moderation infrastructure.**

36.    On October 27, 2022, Elon Musk completed his purchase of the social media platform then known as Twitter. Musk subsequently renamed the social media platform "X," though it also continues to operate at its traditional twitter.com web address. Both before and after acquiring ownership of X, Musk frequently referred to the platform as a "digital town square" or "de facto town square" for public discussion.[19]

---

[19] Douglas Yeung, *The 'Digital Town Square' Problem*, TheRANDBlog (Jan. 13, 2023), https://www.rand.org/pubs/commentary/2023/01/the-digital-town-square-problem.html.

37.    Almost immediately after his takeover, Musk began laying off key executives and content moderators at X responsible for removing hate speech and other violent rhetoric.[20] Indeed, within his first few months of ownership, Musk laid off approximately 80% of the company's staff, including its former CEO, general counsel, policy chief, and head of trust and safety.[21] He downsized or eliminated critical areas of the company responsible for overseeing policy, trust and safety, communications, and ethical AI, among others.[22] These deep workforce cuts raised questions among U.S. lawmakers and regulators about the social media platform's ability to safely respond to security and privacy threats, misinformation, and hate speech—matters of significant public concern in view of Musk's claim that the platform should serve as a digital town square.[23] Lawmakers similarly expressed concern that, in the wake of Musk's ownership, the platform had ceased to comply with two consent decrees it had entered into with the Federal Trade Commission concerning safeguards for personal data and privacy.[24]

38.    Musk also eliminated existing products and policies—many of which served to protect users from misinformation and violent content—under the auspices of promoting "free

---

[20] *See* Brian Fung & Clare Duffy, *How a single year of Elon Musk turned Twitter into a husk of its former self*, CNN (Oct. 27, 2023), https://www.cnn.com/2023/10/27/tech/elon-musk-twitter-x-one-year-changes/index.html. [hereinafter "*A single year of Elon Musk turned Twitter into a husk*"]; *see also Musk fires outsourced content moderators who track abuse on Twitter*, MoneyWatch, CBS News (Nov. 14, 2022), https://www.cbsnews.com/news/elon-musk-twitter-layoffs-outsourced-content-moderators/.

[21] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 18.

[22] *Id.*; *see also* Rohan Goswami, *X CEO Linda Yaccarino explains reason for getting rid of Twitter name*, CNBC (Aug. 10, 2023), https://www.cnbc.com/2023/08/10/x-corp-ceo-linda-yaccarino-says-she-has-autonomy-under-elon-musk.html.

[23] Brian Fung*, First on CNN: US senators question Twitter's privacy compliance under Elon Musk*, CNN (June 5, 2023), https://www.cnn.com/2023/06/05/tech/twitter-compliance-musk-senators/index.html; *see also* Brian Fung, *Elon Musk should be forced to testify on X's 'chaotic environment,' US regulator tells court*, CNN (Sept. 12, 2023), https://www.cnn.com/2023/09/12/tech/elon-musk-testify-privacy-probe/index.html.

[24] *See* Makena Kelly, *Republicans defend Elon Musk in FTC's Twitter probe*, The Verge (July 14, 2023), https://www.theverge.com/2023/7/14/23794363/elon-musk-twitter-ftc-lina-khan-republicans; *see also* Cat Zakrzewski, *Musk may have violated FTC privacy order, new court filing shows*, The Washington Post (Sept. 12, 2023), https://www.washingtonpost.com/technology/2023/09/12/elon-musk-consent-order-ftc/.

speech."[25] He reinstated suspended accounts of known white supremacists and conspiracy theorists while suspending the accounts of journalists who tracked his private air travel.[26]

39.    Unsurprisingly, after the elimination of 80% of X's staff and the dismantling of much of X's content moderation infrastructure, extremist and racist rhetoric surged on X in the wake of Musk's takeover. Less than a month into Musk's ownership, the Brookings Institute reported that the platform had seen a "surge in hateful language" following Musk's purchase, including "a nearly 500% increase in use of the N-word in the 12-hour window immediately following the shift of ownership to Musk."[27] Similarly, within the first week of his ownership, use of the word "Jew" increased fivefold, with tweets that were antisemitic receiving the most engagement.[28] Academic researchers in the School of Communication and Media at Montclair State University published a report describing how "Hate Speech Spike[d] on Twitter After Elon Musk Acquire[d] the Platform."[29]

40.    Less than two months after Musk's takeover, The New York Times reported the following about the rising hate speech on the platform:

- "Before Elon Musk bought Twitter, slurs against Black Americans showed up on the social media service an average of 1,282 times a day. After the billionaire became Twitter's owner, they jumped to 3,876 times a day."

- "Slurs against gay men appeared on Twitter 2,506 times a day on average before Mr. Musk took over. Afterward, their use rose to 3,964 times a day."

---

[25] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 18.

[26] *Id.*

[27] Rashawn Ray and Joy Anyanwu, *Why is Elon Musk's Twitter takeover increasing hate speech?*, Brookings (Nov. 23, 2022), https://www.brookings.edu/articles/why-is-elon-musks-twitter-takeover-increasing-hate-speech/.

[28] *Id.*

[29] *Hate Speech Spikes on Twitter After Elon Musk Acquires the Platform, Montclair State University,* (Nov. 1, 2022), https://www.montclair.edu/school-of-communication-and-media/wp-content/uploads/sites/20/2022/11/Montclair-State-SCM-Study-Increases-in-Twitter-Hate-Speech-After-Elon-Musks-Acquisition.pdf.

- "[A]ntisemitic posts referring to Jews or Judaism soared more than 61 percent in the two weeks after Mr. Musk acquired the site."[30]

41.    A broad array of media outlets extensively reported on this disturbing trend in Musk's self-described "digital town square."

42.    This spike in hateful rhetoric on X caught the attention of the platform's advertisers, many of whom promptly ceased advertising on the platform in the months after Musk took over. Since "the early days of Musk's takeover, many of Twitter's largest advertisers—including the likes of General Mills and the Volkswagen Group—paused their spending over concerns about X's layoffs, content moderation capabilities and general uncertainty about the platform's future."[31]

43.    The pullback of the company's largest advertisers led to sharp drops in its revenue. In July 2023, Musk reported "a 50% decline in ad revenue and heavy debt load," while in September, he reported that advertising revenue in the U.S. was "still down 60%."[32]

44.    More alarming still to X's advertisers was the fact that, after Musk's steep downsizing of company staff, media outlets reported on a flood of hateful and violent rhetoric on the platform—and which reportedly began appearing increasingly often alongside companies' advertising—creating a perceived association between their brands and vile hate speech. X's inability to control the appearance of extremist and violent rhetoric alongside its advertisers precipitated a broader exodus of advertisers from the platform.

45.    Indeed, the media writ large consistently reported for over a year on X and Musk's advertiser' reactions to changes on the X platform, advertisers' concerns over content moderation, and instances of brand placement next to hateful content. Some examples include:

[30] Sheera Frenkel and Kate Conger, *Hate Speech's Rise on Twitter Is Unprecedented, Researchers Find*, N.Y. Times (Dec. 2, 2022), https://www.nytimes.com/2022/12/02/technology/twitter-hate-speech.html.

[31] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 18; *see also* Alberto Chiumento, et al., *Advertisers react to Twitter's new ownership*, Reuters (Nov. 18, 2022), https://www.reuters.com/technology/advertisers-react-twitters-new-ownership-2022-11-03/; Alan Ohnsman, *GM, Ford Say They Aren't Running Twitter Ads As They Assess Changes Under Elon Musk*, Forbes (Oct. 28, 2022), https://www.forbes.com/sites/alanohnsman/2022/10/28/gm-ford-say-they-arent-running-twitter-ads-as-they-assess-changes-under-elon-musk/.

[32] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 18.

- <u>Reuters</u>, "Advertisers react to Twitter's new ownership" (Nov. 18, 2022), https://www.reuters.com/technology/advertisers-react-twitters-new-ownership-2022-11-03/.

- <u>The Washington Post</u>, "Amazon, Uber, Snap ads appear on Twitter pages of white nationalists restored by Musk," Faiz Siddiqui (Dec. 6, 2022), https://www.washingtonpost.com/technology/2022/12/06/twitter-ads-elon-musk/.

- <u>ARS Technica</u>, "Twitter running major brands' ads with extremist tweets—until they get flagged," Ashley Belanger (Dec. 7, 2022), https://arstechnica.com/tech-policy/2022/12/amazon-among-brands-whose-ads-appeared-in-white-nationalist-twitter-feeds/.

- <u>The Verge</u>, "Twitter advertisers aren't happy with ads appearing on pages of white nationalists," Jon Porter (Dec. 7, 2022), https://www.theverge.com/2022/12/7/23497928/twitter-advertisers-brand-safety-unbanned-accounts-white-nationalists.

- <u>Center for Countering Digital Hate</u>, "Toxic Twitter: How Twitter Generates Millions in Ad Revenue by Bringing Back Banned Accounts," (Feb. 9, 2023), https://counterhate.com/wp-content/uploads/2023/02/Toxic-Twitter_FINAL.pdf.

- <u>The Washington Post</u>, "Extremist influencers are generating millions for Twitter, report says," Taylor Lorenz (Feb. 9, 2023), https://www.washingtonpost.com/technology/2023/02/09/twitter-ads-revenue-suspended-account/.

- <u>The Kansas City Star</u>, "Mizzou ad appears on racist X page as social media site faces concerned advertisers," Jonathan Shorman (Oct. 10, 2023), https://www.kansascity.com/news/politics-government/article280309284.html.

- <u>Business Insider</u>, "Disney, Microsoft, the NBA Had Twitter Ads Next to Neo-Nazi Propaganda," Katherine Tangalakis-Lippert (June 18, 2023), https://www.businessinsider.com/disney-microsoft-nba-twitter-ads-next-to-neo-nazi-propaganda-2023-6.

- The N.Y. Post, "Disney, Microsoft ads on Twitter show up next to neo-Nazi propaganda as advertisers return: report," Shannon Thaler (June 19, 2023), https://nypost.com/2023/06/19/disney-microsoft-ads-on-twitter-show-up-next-to-neo-nazi-propaganda-report/.

46.    None of these articles cited or otherwise indicated that they relied on research or reporting performed by Media Matters, Carusone, or Hananoki.

**III.    Plaintiffs participated in the national conversation regarding extremist content on X.**

47.    As part of its long-running mission to document and report on extremist political rhetoric in the media, Media Matters began investigating, researching, and reporting on the rise in political extremism and bigotry on X after Musk's changes to the platform. Hananoki, as a Senior Investigative Reporter whose beat included political extremism, was often assigned this work.

48.    Media Matters' research and reporting echoed what was being reported widely elsewhere—that the platform was continuing to permit the placement of advertisements alongside extremist content. Plaintiffs thus joined in ongoing national conversations about an important news story: the surge of hateful and violent rhetoric in America's supposed "digital town square."

49.    Hananoki's research and reporting sometimes looked specifically at what advertisements X's increasingly extremist user base might see on the platform. Following ordinary journalistic investigative practices, Hananoki used an existing X research account—created and used for research well before Musk's takeover and solely for Hananoki's work on behalf of Media Matters—to see what advertising X's computer algorithm would allow to be placed next to white nationalist content. His research confirmed that the platform's system was continuing to permit advertisements next to such content.

50.    Hananoki published some of his findings, along with a handful of examples, in an article on November 16, 2023. Ex. D. That article, entitled "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content," also reported on Musk's apparent endorsement of a widespread antisemitic conspiracy theory—that Jewish people are seeking to promote "hatred against whites" and are

seeking to "flood[] the[] country" with "hordes of minorities"—which drew widespread condemnation and was extensively covered in the media.[33]

51.    Hananoki's article included screenshots of six advertisements from major corporate entities appearing with at least nine posts from X users. For example, below are images of an advertisement for Oracle appearing with a quote from Adolf Hitler, as well as an advertisement for the Bravo television network next to a post praising Hitler's Nazi Party, which were included in his article:



52.    Hananoki did not say in his article that X, or anyone associated with X, was intentionally placing advertisements next to such violent or fringe content. He simply reported truthfully that despite claiming otherwise, the platform permitted the placements of advertisements from some of the nation's biggest advertisers next to posts that touted Hitler or the Nazi party— which the platform's algorithm obviously did, as illustrated by the examples he cited. *See* Ex. D.

---

[33] *See, e.g.*, David Goldman, "Elon Musk agrees with antisemitic X post that claims Jews 'push hatred' against White people," CNN (Nov. 17, 2023), https://www.cnn.com/2023/11/15/media/elon-musk-antisemitism-white-people/index.html.

53.    Hananoki researched, fact-checked, and drafted the November 16 article in accordance with Media Matters' policies and standards, using similar methods to those he has used throughout his long career in journalism, and mirroring common journalistic practices.

54.    Hananoki published his article at a time when X was reassuring advertisers that its platform was safe. On August 10, 2023, X Corp. CEO Linda Yaccarino appeared on CNBC and stated that "by all objective metrics, X is a much healthier and safer platform than it was a year ago. Since acquisition, we have built brand safety and content moderation tools that have never existed before at this company."[34] As she told her interviewer, with respect to "lawful but awful" content, brands "are protected from the risks of being next to that content."[35] The evidence presented in Hananoki's article undermined this claim—and triggered Musk's rage.

**IV.    Musk promises "thermonuclear" litigation against Media Matters in an effort to recast blame for lost advertising revenue.**

55.    On November 18, Musk posted on X a promise to file "a thermonuclear lawsuit against Media Matters" in response to the November 16 article.[36] The post received hundreds of thousands of likes and comments, and tens of thousands of reposts. *Id.*



56.    Musk attached a message to the post referencing Hananoki's November 16 article and accusing Media Matters of manipulating X's algorithm to artificially force the placement of ads next to extremist content.[37] Musk's diatribe focused on Media Matters' use of the X platform

---

[34] CNBC Television, *X Corp. now a much healthier and safer platform than a year ago, says Linda Yaccarino* (Aug. 10, 2023), https://www.youtube.com/watch?v=NUqtBkiuRKs&t=14s.

[35] *Id.*

[36] @elonmusk, X.com (Nov. 18, 2023, 2:01 AM), https://perma.cc/X4HN-PLJ4.

[37] *Id.*

to supposedly create a "contrived" scenario in which advertisements appeared next to extremist content:

> **Here are the facts on *Media Matters'* research:**
>
> - To manipulate the public and advertisers, *Media Matters* created an alternate account and curated the posts and advertising appearing on the account's timeline to misinform advertisers about the placement of their posts. These contrived experiences could be applied to any platform.
> - Once they curated their feed, they repeatedly refreshed their timelines to find a rare instance of ads serving next to the content they chose to follow. Our logs indicate that they forced a scenario resulting in **13 times** the number of ads served compared to the median ads served to an X user.
> - Of the **5.5 billion ad impressions** on X that day, **less than 50 total ad impressions** were served against all of the organic content featured in the *Media Matters* article.
>   - For one brand showcased in the article, one of its ads ran adjacent to a post 2 times and that ad was seen in that setting by only two users, one of which was the author of the *Media Matters* article.
>   - For another brand showcased in the article, two of its ads served adjacent to 2 posts, 3 times, **and that ad was only seen in that setting by one user, the author of the *Media Matters* article.**
> - *Media Matters'* article also highlights nine posts they believe should not be allowed on X. Upon evaluation, only one of the nine organic posts featured in the article violated our content policies, and we've taken action on it under our Freedom of Speech, Not Reach enforcement approach.

57.    Musk's November 18 post made no mention of the year-long parade of reports and documentation illustrating this endemic problem with the architecture of the X platform.

## V.    X Corp. files a retaliatory lawsuit in the Northern District of Texas.

58.    On November 20, 2023, Musk's company X Corp. made good on Musk's promise: It filed a lawsuit naming Media Matters and Hananoki as defendants in federal court in the Northern District of Texas, alleging claims for Interference with Contract, Business Disparagement, and Interference with Prospective Economic Advantage. *X Corp. v. Media Matters for America et al.*, No. 4:23-cv-1175 (N.D. Tex), Dkt. 1. On February 2, 2024, X Corp. filed an amended complaint adding Carusone as a defendant. Ex. E (*X Corp. v. Media Matters for America et al.*, No. 4:23-cv-1175 (N.D. Tex), Dkt. 37).

59.    X Corp. chose to file its lawsuit in the Northern District of Texas despite the fact that, at the time, it was headquartered in San Francisco and the defendants (Media Matters, Carusone, and Hananoki) are residents of Washington, D.C. and Maryland.

60.    X Corp.'s lawsuit alleges that Media Matters "knowingly and maliciously manufactured side-by-side images depicting advertisers' posts on X Corp.'s social media platform

beside Neo-Nazi and white-nationalist fringe content," and that it "designed" these images as part of a "media strategy to drive advertisers from the platform and destroy X Corp." Ex. E, ¶7.

61.    According to X Corp., this was part of an ideological crusade on behalf of Media Matters and its President, Carusone. X Corp. alleges that "Carusone made Media Matters' strategy plain: pressure advertisers into leaving the platform if Twitter, now X, did not capitulate to Media Matters' censorship demands." *Id.* ¶34.

62.    X claims that in order to generate the advertisement-content pairings upon which Media Matters reported, Media Matters "created utterly extraordinary and manufactured circumstances that no organic user would undertake" and "deliberately misused the X platform to induce the algorithm to pair racist content with popular advertisers' brands" in order to mislead readers. According to X Corp., this "manipulation" of the platform, and Media Matters truthful reporting on its results, "harmed X Corp.'s business relationships and advertising contracts with numerous companies" by creating the impression that such pairing regularly occur on X Corp.'s platform. *Id.*, ¶ 8.

63.    X Corp. breaks down Media Matters' supposed "manipulation" of the platform, echoing the claims made by Musk just days before. Specifically, it claims:

> Media Matters accessed accounts that had been active for at least 30 days, bypassing X's ad filter for new users. Media Matters then exclusively followed a small subset of users consisting *entirely* of accounts in one of two categories: those known to produce extreme, fringe content, and accounts owned by X's big-name advertisers. The end result was a feed precision-designed by Media Matters for a single purpose: to produce side-by-side ad/content pairings that it could screenshot in an effort to alienate advertisers.

*Id.* ¶ 9. In other words, X conceded that depending on what content a user follows and how long they've had their account, they might see advertisements placed next to extremist content.

64.    X Corp. nevertheless expands on this description of Media Matters' supposed misconduct: "First, Media Matters set out on their attempt to evade X's content filters for new users by specifically using an account that had been in existence for more than thirty days." *Id.* ¶51.

65.    "Next," X Corp. claims, "Media Matters set its account to follow only 30 users (far less than the average number of accounts followed by a typical active user, 219), severely limiting

the amount and type of content featured on its feed. All of these users were either already known for posting controversial content or were accounts for X's advertisers. That is, 100% of the accounts Media Matters followed were either fringe accounts or were accounts for national large brands. In all, this functioned as an attempt to flood the Media Matters account with content only from national brands and fringe figures, tricking the algorithm into thinking Media Matters wanted to view both hateful content and content from large advertisers." *Id*. ¶52.

66.    Then, X Corp. claims, "Media Matters' account started to alter its scrolling and refreshing activities in an attempt to manipulate inorganic combinations of advertisements and content. Media Matters' excessive scrolling and refreshing generated between 13 and 15 times more advertisements per hour than would be seen by a typical user, attempting to forcibly generate a pairing of fringe content and paid advertisements by massive repetition unlike anything that any normal user would encounter under typical, or even extraordinary, conditions." *Id*. ¶53.

67.    X Corp.'s complaint admits that, after allegedly following these steps, X Corp.'s algorithm returned the advertisement-content pairings featured in the November 16 article. *Id*. ¶54.

68.    The complaint alleges that all Plaintiffs participated in and benefitted from the alleged X platform manipulation: it alleges that Hananoki authored false articles, Media Matters and its President Carusone published the articles, and that Carusone amplified the allegedly false premise of the article in a television interview—all in furtherance of their joint, ideologically driven crusade against X.

69.    X Corp. alleges that because Media Matters reported on the results of its purportedly "forced, inauthentic" use without listing what accounts Media Matters followed or how frequently it refreshed its screen, Media Matters is liable to X Corp. for hundreds of millions of dollars in lost advertising revenue.

**VI.    X continues its litigation campaign and directs its affiliates to file duplicative lawsuits abroad.**

70.    X Corp.'s retaliation against Plaintiffs did not end with the Texas lawsuit. Instead, in the following weeks and months, X, through its international affiliates, threatened and initiated litigation abroad over the very same use of the X platform.

1

2

      **A.**    **Twitter Asia Pacific threatens and files suit over the same conduct alleged in the Texas Complaint.**

3

4

      71.    On December 7, 2023, Singapore-based Defendant Twitter Asia Pacific ("TAP") sent Media Matters a cease and desist letter citing the November 16 article and alleging that Media Matters had manipulated the X Platform in the same set forth in X's Texas Complaint. *See* Ex. C, ¶45. The letter claimed that Media Matters had created manufactured the content-advertisement pairings that appeared in the November 16 article through its purportedly inorganic use of the X Platform, and that as a consequence TAP has lost advertising revenue of at least "USD$1,065,000." *Id*. ¶45(f)

5

6

7

8

9

10

      72.    On July 23, 2024, TAP initiated suit against Media Matters in Singapore, based on Media Matters' purported manipulation of the X platform and its reporting on the results in the November 16 article. Ex. C. The suit asserts claims for Defamation and Malicious Falsehood.

11

12

13

      73.    TAP alleges that it was defamed by the November 16 article, despite not being mentioned in the piece, because, *inter alia*, "[t]he Defamatory Statements referred and/or were understood to refer to the X Platform and [TAP]." *Id*. ¶12. According to the complaint, a reasonable reader in Singapore would understand "*[Elon Musk's] social media platform*" and "*X*" to refer to the X Platform and TAP. *Id*. (italics and brackets in original). TAP is the X platform's client-facing entity in the Asia Pacific region. *Id*.

14

15

16

17

18

19

      74.    The TAP complaint sets forth the same conduct by Media Matters alleged in the Texas complaint. Specifically, according to the TAP complaint, Media Matters "and/or" Hananoki "deliberately manufactured" the ad placements through a "scheme" consisting of multiple steps intended to "overcome the 3-layered content moderation mechanism" that X has in place. Ex. C, ¶¶28–29:

20

21

22

23

24

25

26

      (a)   First, MM and/or Mr. Hananoki utilized an account that had been active for at least 30 days ("Decoy Account") to bypass the X Platform's additional advertisement filter for new users. This increased MM and/or Mr. Hananoki's chances of procuring X Group's major clients' advertisements on their feed.

27

28

      (b)   Second, MM and/or Mr. Hananoki ensured that the Decoy Account exclusively followed a small subset of X Platform users falling into one of two categories: (i) those known to produce extreme, fringe content and (ii) X Group's major advertising clients. MM and/or Hananoki took this deliberate step to game the

algorithm set up in the X Platform's content moderation mechanism—an algorithm that the X Group had designed to protect bona fide users of the X Platform from objectionable content. To further amplify their efforts, MM and/or Mr. Hananoki set the Decoy Account to follow only 30 users (far less than the average number of accounts followed by a typical active user, i.e., 219), thus severely limiting the amount and type of content featured on their feed.

(c) Third, MM and/or Mr. Hananoki repeatedly scrolled and refreshed their unrepresentative, hand-selected feed, generating between 13 and 15 times more advertisements per hour than viewed by the average X Platform user. . . .

*Id.*, ¶29 .

75.     Like the Texas Complaint, the TAP Complaint concedes that the X Platform did in fact show the Media Matters account the ad pairings featured in the article as a consequence of the alleged use. *Id.* ¶30.

76.     The TAP Complaint states that TAP issued demands to Media Matters and Hananoki prior to bringing suit, but that "[Media Matters] and Mr. Hananoki have failed and/or refused to comply with [TAP's] Demands." *Id.* ¶46. The TAP Complaint asserts damages for Media Matters' reporting on the results of its use of X's platform amounting to "approximately USD 12,935,231." *Id.* ¶43.

77.     The parties are currently litigating Media Matters' jurisdictional challenge in Singapore, with a hearing scheduled for April 14, 2025. Media Matters has consistently contested jurisdiction and venue in Singapore. Media Matters has represented in the Singapore action that if TAP dismisses its Singapore action and refiles its claims in California, Media Matters will not assert a statute of limitation defense to those claims.

78.     Upon information and belief, TAP filed its suit against Media Matters at the direction of its parent corporation, X Corp. The TAP suit makes the same allegations set forth in X Corp.'s Texas suit; relies on internal "investigations" performed by the "X Group" that echo the investigation cited by the Texas Complaint, Ex. C, ¶29; and was first threatened shortly after X Corp. CEO Elon Musk threatened to file "thermonuclear" litigation against Media Matters in response to the November 16 article. It also makes good on Musk's promise that the Texas lawsuit filed by X Corp. was "[t]he first of many," and his representation that X is "suing [Media Matters] in every country that they operate." *See also supra*, ¶¶27–29.

**B.**   **Twitter International Unlimited Co. files suit alleging the same conduct alleged in the Texas Complaint.**

79.   On December 7, 2023, Twitter International Unlimited Co. ("TIUC") served a summons on Media Matters for litigation in Ireland. Ex. F. The affidavit accompanying the summons cites the November 16 article, alleges the same use of the X Platform by Media Matters as alleged in Texas and Singapore, and asserts intended claims for defamation and malicious falsehood. It claims that TIUC has "sustained advertising revenue losses in excess of the equivalent of EUR2,000,000." *Id*. ¶29.

80.   Media Matters' November 16 article does not name TIUC. However, TIUC's Statement of Claim nevertheless alleges that the article's statements about "X" defamed TIUC because, *inter alia*:

(i)    "Twitter International is a subsidiary of X Corp.;"

(ii)   "Twitter International's identity is synonymous with that of X Corp.;" and

(iii)  "Twitter International is identified and/or identifiable as an entity responsible for the operation of the X platform"

Ex. B, ¶21.

81.   As in both the Texas and Singapore complaints, TIUC alleges that Media Matters "manipulated" the X Platform to "evade" safeguards in place for brands. According to TIUC's complaint,

> When users show interest in particular topics, ads will generate that relate to those topics. Media Matters exploited these features by using a secret existing X account, on a non-paying plan ("**the Secret Account**") precision-designed to evade normal safeguards, which manipulated the system through which posts and advertisements appear.

*Id*. ¶ 12.

82.   As in both the Texas and Singapore complaints, TIUC goes on to allege:

- Media Matters "attempted to evade X's content filters for new users, which excludes ads being served to newly created accounts as a safety measure, by specifically using an account that had been in existence for more than thirty days;"

- "It set the Secret Account to follow only 30 users (far less than the average number of accounts followed by a typical active user (219)), severely limiting the amount and type of content featured on its feed," in an "an attempt to flood the Secret Account with content only from large brands and fringe figures, tricking the algorithm into thinking that the Secret Account wanted to view both hateful content and content from large advertisers;" and

- "[A]ltered its scrolling and refreshing activities in an attempt to manipulate inorganic combinations of advertisements and content. The Secret Account's excessive scrolling and refreshing generated between 13 and 15 times more advertisements per hour than would be seen by a typical user, essentially seeking to force a situation in which a brand ad post appeared adjacent to fringe content."

*Id*. ¶¶14–15.

83.    And as in both the Texas and Singapore complaints, TIUC concedes that Media Matters' use of the X platform did in fact result in the content-advertisement pairings depicted and reported on in the November 16 article. *Id*. ¶¶12, 15.

84.    TIUC seeks damages from Media Matters for lost advertising revenue. *Id*. ¶28, p.8.

85.    The parties are currently litigating Media Matters' jurisdictional challenge in Ireland, as to which a hearing on the merits has yet to be set but is expected by May 2025. Media Matters has consistently contested jurisdiction and venue in Ireland.

86.    Upon information and belief, TIUC filed its suit against Media Matters at the direction of its parent corporation, X Corp. The suit makes the same allegations set forth in X Corp.'s Texas suit—in some instances verbatim; it repeats the same internal investigation findings; and it was filed shortly after X Corp. CEO Elon Musk threatened to file "thermonuclear" litigation against Media Matters in response to the November 16 article. And, once again, it makes good on Musk's promise that the Texas lawsuit filed by X Corp. was "[t]he first of many," and his representation that X is "suing [Media Matters] in every country that they operate." *See also supra*, ¶¶27–29.

**C.    Twitter UK Ltd. threatens suit over the same conduct alleged in the Texas Complaint.**

87.    On December 19, 2023, Twitter UK ("TUK") sent Media Matters a demand letter citing the November 16 article and threatening defamation litigation in the UK. Ex. G. Twitter UK

is a subsidiary of X Corp. that markets and sells advertising services on the X platform to advertisers in the United Kingdom.

88.    As in the complaints filed by its affiliates, TUK's demand letter claims that Media Matters manipulated the X platform by: (1) using X accounts that had existed for more than 30 days, allegedly to avoid safeguard in place for new users; (2) exclusively following a small subset of users consisting of accounts expressing far-right views and those of well-known brands; and (3) refreshing or scrolling at a higher-than-average rate to generate more advertisement/content pairings than the average user would see. *Id*. ¶13.

89.    While the demand letter threatens a claim for defamation, TUK also asserts that this conduct was "in breach of X's Platform Manipulation and Spam Policy," which is incorporated into the TOS. *Id*.

90.    Upon information and belief, TUK threatened its suit against Media Matters at the direction of its parent corporation, X Corp. The demand letter makes the same allegations set forth in X Corp.'s Texas suit, and it was sent shortly after X Corp. CEO Elon Musk threatened to file "thermonuclear" litigation against Media Matters in response to the November 16 article. And, yet again, it is consistent with Musk's own promise of multiple lawsuits against Media Matters to be filed around the world. *See also supra*, ¶¶27–29.

## VII.    The X Terms of Service contain a broad forum selection clause that governs the X Entities' cases.

91.    Every X user must agree to X's TOS when creating an account. X itself has described the account creation process as follow:

> To create a Twitter account, a prospective user must go through an online sign up process to choose a username and provide certain other information. Before prospective users can click a button that allows them to complete the process, they are presented with a message telling them that by signing up to Twitter and creating an account, they are agreeing to Twitter's TOS. . . . The message contains a link to the TOS. [ ] While the precise language of the message may have changed over time, users have always had to affirmatively agree to the TOS before signing up for a Twitter account, and a link to the TOS was always presented to them as part of the sign up process.

X Doshier Motion at 3–4 (citations omitted). This process applied to the account at issue here.

92.    Media Matters reporter Eric Hananoki created in July 2020 the X account that generated the ad pairings discussed in the November 16 article that precipitated X's claims. In doing so, he agreed to the X TOS.  Hananoki used the account to conduct research on behalf of Media Matters. In November 2023, he accessed the account to conduct research on X, Musk, and Twitter advertisers as detailed in the November 16, 2023 article.

93.    Hananoki was a Media Matters employee acting in the scope of his employment when creating and using the X account he used for researching the November 16 article.

94.    The TOS contain a broad venue and choice-of-law clause requiring parties to bring all claims related to X's "Services" in California courts:

> The laws of the State of California, excluding its choice of law provisions, will govern these Terms and any dispute that arises between you and us. ***All disputes related to these Terms or the Services will brought solely in the federal or state courts located in San Francisco County, California, United States***, and you consent to personal jurisdiction and waive any objection as to inconvenient forum. To the extent permitted by law, you also waive the right to participate as a plaintiff or class member in any purported class action, collective action, or representative action proceeding.

Ex. A at 10 (emphasis added).

95.    The TOS broadly define "Services" to include any use of X products, including what X describes in this lawsuit as its platform: "These Terms of Service ('Terms') govern your access to and use of our various websites, SMS, APIs, email notifications, applications, buttons, widgets, ads, commerce services, and our other covered services (https://help.x.com/rules-and-policies/x-services-and-corporate-affiliates) that link to these Terms (collectively, the Services)." *Id*. at 2–3.

96.    As set forth *supra*, each of the actions filed by the X Entities rest their respective liability theories on Plaintiffs' use of the X Platform and Media Matters' alleged "manipulation" of the algorithm, "evasion" of safeguards, and "fabrication" of the advertisement-content pairings viewed by the account. Each lawsuit alleges that X investigated Plaintiffs' specific use of the platform in order to determine the information underlying their claims, and asserts that Plaintiffs improperly: (1) used "secret" accounts that had existed for more than 30 days, purportedly to avoid the safeguards X claims it has in place for new users; (2) exclusively followed a small subset of users consisting of accounts expressing far-right views and those of well-known brands in order to

"trick" the algorithm; and (3) refreshed and scrolled at a high rate to generate more advertisement/content pairings than the average user would see.

97.    The X Entities' allegations against Plaintiffs plainly "relate[] to . . . the Services." Accordingly, the forum selection clause governs their actions, and those actions should have been filed in either state or federal court in San Francisco County, California.

98.    At least as of November 26, 2023—when Carusone gave a television interview that X describes in its Texas complaint as amplifying the message in the November 16 article—Carusone was aware that Hananoki had created and used an X account for Media Matters research, including research for the November 16 , 2023 article that forms the basis of X's lawsuits. Carusone was also aware that in creating the account, Hananoki agreed to the X (then known as Twitter) Terms of Service in effect at the time he created the account. Carusone was also aware that those Terms of Service included a California venue provision.

99.    The TOS states that it is between the user and X Corp. Ex. A at 3.

100.    The TOS also contains multiple benefits expressly for the "X Entities," which it defines as "X Corp., its parents, *affiliates, related companies*, officers, directors, employees, agents, representatives, partners, and licensors." *Id*. at 9 (emphasis added). Specifically, the TOS states that:

> THE **X ENTITIES** DISCLAIM ALL WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT. The **X Entities** make no warranty or representation and disclaim all responsibility and liability for: (i) the completeness, accuracy, availability, timeliness, security or reliability of the Services or any Content; (ii) any harm to your computer system, loss of data, or other harm that results from your access to or use of the Services or any Content; (iii) the deletion of, or the failure to store or to transmit, any Content and other communications maintained by the Services; and (iv) whether the Services will meet your requirements or be available on an uninterrupted, secure, or error-free basis. No advice or information, whether oral or written, obtained from the **X Entities** or through the Services, will create any warranty or representation not expressly made herein.

*Id*. (bolding added).

101.    The TOS also contains a Limitation of Liability provision benefitting the X Entities:

> THE **X ENTITIES** SHALL NOT BE LIABLE FOR ANY INDIRECT,
> INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, OR
> ANY LOSS OF PROFITS OR REVENUES, WHETHER INCURRED
> DIRECTLY OR INDIRECTLY, OR ANY LOSS OF DATA, USE, GOODWILL,
> OR OTHER INTANGIBLE LOSSES, RESULTING FROM (i) YOUR ACCESS
> TO OR USE OF OR INABILITY TO ACCESS OR USE THE SERVICES; (ii)
> ANY CONDUCT OR CONTENT OF ANY THIRD PARTY ON THE
> SERVICES, INCLUDING WITHOUT LIMITATION, ANY DEFAMATORY,
> OFFENSIVE OR ILLEGAL CONDUCT OF OTHER USERS OR THIRD
> PARTIES; (iii) ANY CONTENT OBTAINED FROM THE SERVICES; OR (iv)
> UNAUTHORIZED ACCESS, USE OR ALTERATION OF YOUR
> TRANSMISSIONS OR CONTENT.

*Id.* at 9–10 (bolding added).

102.    TAP and TIUC are both "affiliates" and "related companies" of X Corp. and are consequently third-party beneficiaries of the TOS such that they are bound by its forum selection clause for "All disputes related to . . . the Services" that they have with Plaintiffs. Their decision to file lawsuits in foreign jurisdictions breached their obligations under the TOS.

103.    TAP and TIUC are bound by the TOS for the separate reason that they are alter egos of X Corp., both premising their claims on the notion that TAP and TIUC are respectively synonymous with "X." Both entities represent the X Platform, which is owned and maintained by X Corp., serving as the public face of X in their respective regions. Furthermore, upon information and belief as set forth in this complaint, TAP and TIUC filed their respective lawsuits against Media Matters on behalf of X Corp.: Musk himself acknowledged that X Corp.'s suit filed in Texas was but "The first of many," and he has promised that X Corp. will sue Media Matters "in every country that they operate." X Corp. is making good on that promise through its subsidiaries TAP and TIUC. *See also supra*, ¶¶27–29.

104.    TAP and TIUC are further bound by the forum selection clause because, for all the reasons set forth above, they are closely related to the contractual relationship.

**VIII.    The X Entities' campaign against Plaintiffs is part of an ongoing attempt to shift blame for X's lost advertising review and stifle critics.**

105.    Musk's proclamation that he would pursue "thermonuclear" litigation against Plaintiffs, and the subsequent international legal campaign initiated and directed by his company X Corp., are part of Musk's broader effort to blame anyone other than himself for X's sharp decline

in advertising revenue since his takeover—and to stifle any criticism that might hurt his bottom line.

106.    Musk has in the past acknowledged the role of his own behavior on advertisers' decision to flee the X platform: In an interview with CNBC following controversial X posts in which Musk criticized George Soros—and which critics characterized as antisemitic—Musk stated, "***I'll say what I want, and if the consequence of that is losing money, so be it***."[38]

107.    In an interview with Andrew Sorkin as part of the November 29, 2023 Dealbook Summit—just over a week after X Corp. filed its suit against Media Matters—Sorkin mentioned advertisers stopping their advertising in response to Musk's posts, to which Musk stated "I hope they stop. Don't advertise. . . . If somebody's going to try to blackmail me with advertising, blackmail me with money, go fuck yourself."[39]

108.    But as X continued to bleed advertising revenue, Musk was also in need of a scapegoat—and Media Matters is but one of many.

109.    For instance, on September 4, 2023, Musk took to X claiming that the ADL, which criticized X for platforming antisemitic speech, had caused X's US advertising revenue to plummet.[40]



---

[38] Mike Calia, "Elon Musk: 'I'll say what I want, and if the consequence of that is losing money, so be it,'" CNBA (May 16, 2023), https://www.cnbc.com/2023/05/16/elon-musk-defends-inflammatory-tweets-ill-say-what-i-want.html.

[39] Transcript, DealBook Summit 2023 Elon Musk Interview, https://www.rev.com/transcripts/dealbook-summit-2023-elon-musk-interview-transcript.

[40] @elonmusk, X.com (Sept. 4, 2023, 10:52 AM), https://x.com/elonmusk/status/1698755938541330907.

110.    That same day, Musk used his platform to threaten defamation litigation against ADL—despite numerous outlets reporting on the proliferation of antisemitic content on X.[41]



111.    In another post that day, Musk claimed the ADL "would potentially be on the hook for destroying half the value of the company, so roughly $22 billion."[42]

112.    While X did not sue ADL, another organization that dared to publicly say something Musk disliked was not so lucky. On July 31, 2023, X Corp. filed suit against the Center for Countering Digital Hate ("CCDH"), a non-profit corporation dedicated to combatting online hate speech and disinformation. Unlike this case, X filed suit in this District, referencing the forum selection clause of the Terms of Service specifying venue in San Francisco. *X Corp. v. Center for Countering Digital Hate, Inc.*, 3:23-cv-03836-LB (N.D. Cal.), ECF 1 ¶14.

113.    Aside from venue, however, the CCDH suit bears a striking resemblance to X's campaign against Media Matters. As with Media Matters, X characterizes the non-profit CCDH as an activist organization "masquerading as a research agenc[y]" that "embarked on a scare campaign to drive away advertisers from the X platform." *X Corp. v. Center for Countering Digital Hate, Inc.*, 3:23-cv-03836-LB (N.D. Cal.), ECF 1 ¶1. As with Media Matters, X alleges CCDH improperly obtained information from X's platform and then presented it without context "to make it appear as if X is overwhelmed by harmful content, and then used that contrived narrative to call for companies to stop advertising on X." *Id.* ¶2. And as with Media Matters, X attributed its lost advertising revenue to CCDH's public reporting on its use of information from the X platform—

---

[41]    @elonmusk, X.com (Sept. 4, 2023, 3:41 PM), https://x.com/elonmusk/status/1698828606598734225.

[42]    @elonmusk, X.com (Sept. 4, 2023 3:53 PM), https://x.com/elonmusk/status/1698831606943801525.

reporting X disliked. *Id.* ¶5. In his March 2024 order dismissing the case, Judge Breyer found that, "Sometimes it is unclear what is driving a litigation, and only by reading between the lines of a complaint can one attempt to surmise a plaintiff's true purpose. Other times, a complaint is so unabashedly and vociferously about one thing that there can be no mistaking that purpose. This case represents the latter circumstance. This case is about punishing the Defendants for their speech." *X Corp. v. Ctr. for Countering Digital Hate, Inc.*, 724 F. Supp. 3d 948, 955 (N.D. Cal. 2024). Indeed.

114.   X has even gone so far as to sue ***advertisers themselves*** for declining to buy advertisements on X's platform.[43]

115.   X Corp.'s multiplicity of suits against Media Matters is part of a broader strategy to intimidate the media and recoup lost advertising dollars by any means possible. It has cost Media Matters millions to litigate and forced Media Matters to layoff over a dozen employees—a result that Musk has publicly celebrated. On May 23, 2024, a Media Matters employee posted on X that she had been "laid off from @mmfa, along with a dozen colleagues." The account "Libs of TikTok" (a far-right account best known for amplifying anti-LGBTQ hate speech[44]) reposted the employee's post announcing that she'd been laid off, to which Musk responded, "Karma is real."[45]

116.   Another X user posted that same day celebrating that Media Matters was "experiencing the biggest mass of layoffs, with over a dozen terminations" as a consequence of X's lawsuit, claiming that Media Matter "f'd around [and] found out." Musk responded to the post, "Yup."[46]

---

[43] *See* Associated Press, *Elon Musk's X sues advertisers over alleged 'massive advertiser boycott' after Twitter takeover* (August 6, 2024), https://apnews.com/article/x-sues-advertisers-unilever-cvs-mars-orsted-673d1ae88e9fb0ca5b170d238739453e.

[44]    https://www.congress.gov/118/meeting/house/115561/documents/HHRG-118-IF16-20230328-SD069.pdf.

[45]    @elonmusk,    X.com    (May    23,    2024    5:03    PM), https://x.com/elonmusk/status/1793794871548858798?s=46.

[46]    @elonmusk,    X.com    (May    23,    2024    2:21    PM), https://x.com/stillgray/status/1793754245088653556.

117.    X Corp.'s decision to file in multiple jurisdictions across the globe is intended to chill Media Matters' reporting and drive up costs—both of which it has achieved—and it is directly foreclosed by X's own Terms of Service.

**IX.    Plaintiffs face ongoing harm.**

118.    Media Matters faces imminent, ongoing harm as a consequence of being forced to defend itself on multiple fronts. It has a status conference set in less than two weeks in Ireland, at which the court will set a date to hear Media Matters' jurisdictional challenges. In Singapore, the hearing on the merits of Media Matters' jurisdictional challenge is set for April 14, 2025. Media Matters should not have to defend against attempts by X to hale Media Matters into court in foreign jurisdictions when the parties already agreed on the appropriate forum for any dispute related to X's services. That is—this Court.

119.    Media Matters, a non-profit organization, has been forced to spend millions of dollars defending against X's multiple suits. The fact that Media Matters must defend itself on multiple fronts does more than simply drive up costs: It means that Media Matters cannot focus its time and resources to mounting the best possible defense in one forum and must instead fight back piecemeal. Particularly given resource constraints, this divided approach prejudices Media Matters' ability to most effectively defend itself.

120.    X's litigation campaign against Plaintiffs has also significantly chilled Media Matters' and its employees' reporting. For instance, in the ten months preceding the lawsuit, Hananoki authored at least 16 articles critiquing Musk and/or X's approach to moderating hateful content on the platform. Since X's first lawsuit was filed, however, Hananoki has not authored any articles critiquing Musk and/or X's approach to moderating hate speech or extremist content on the X platform. He has written no articles critical of X's policies or business decisions at all since November 17, 2023, nor has he written about Musk in a single article since November 17, 2023— despite Musk being a prominent figure in national news that Hananoki would otherwise report on.

121.    X's Texas lawsuit made both Media Matters and Hananoki the target of threats and hate speech, and they have reason to fear its international suits will cause further online targeting: Media Matters is the named plaintiff in each; Hananoki is personally named as having supposedly

manipulated the X Platform in the Twitter Asia Pacific complaint; and Hananoki's research for the November 16 article forms the basis of both foreign suits. One public post on X, responding to a post by Hananoki regarding his article for Media Matters, stated: "I hope Elon sues the absolute ass out of you shameless hacks for this and it looks like he will be. Hope it was worth it."[47]   Private messages to Hananoki have included sentiments such as "PEDOPHILE FUCK WE HAVE ALL THE DOCUMENTS ON YOUR SORRY ASS" and "You're so fucked Eric! Elon is coming for you." And Media Matters received so many threats in the months following Musk's November 18 post and subsequent litigation that it was forced to increase its security for employees. The multiple pending suits around the world only increase the likelihood of further harassment.

122.    X has sought to obtain through discovery in Texas highly sensitive information from Media Matters and its reporters, including all of Hananoki's notes, drafts, source records, communications, and other documents that so much as mention X or Musk. Given the identical allegations in its foreign suits, TIUC and TAP will presumably do the same in their respective suits as well. While Hananoki did not use any confidential sources for the November 16 article, in order to avoid continuing to generate potentially discoverable information, including confidential source information, he has refrained from reporting about X and Musk. X's demands have also caused Hananoki to actively avoid communicating with or seeking out sources out of fear that they may be targeted as well. Indeed, as a consequence of X's litigation, Hananoki has largely stopped working as a Senior Investigative Reporter and his work is now primarily dedicated to defending not only himself in Texas, but also Media Matters in the multiple lawsuits X has launched around the world based on his work.

## CAUSES OF ACTION AND CLAIMS FOR RELIEF

### COUNT I

### Breach of Contract – Against X Corp. (Domestic Litigation)

123.    Plaintiffs incorporate all allegations set forth in this complaint, *supra*.

124.    The X Terms of Service ("TOS") is a valid and enforceable contract that X has in other contexts sought to enforce. Plaintiffs performed under the contract: they have used the

---

[47] @PotatoForeskins, X.com (Nov. 19, 2023, 12:23 PM ET), https://x.com/PotatoForeskins/status/1726290138312155338 [https://perma.cc/K3T4-JCYR].

account that generated the content depicted in the November 16 article in compliance with the terms set forth in the TOS, which is attached as Exhibit A.

125.    The TOS contains a forum selection clause stating, "All disputes related to these Terms or the Services will be brought solely in the federal or state courts located in San Francisco County, California, United States, and you consent to personal jurisdiction and waive any objection as to inconvenient forum." Ex. A at 10.

126.    Defendants are each bound by the TOS. X Corp. is a signatory, and TAP and TIUC are bound as third party beneficiaries, alter egos of X Corp., and as parties closely related to the contractual relationship.

127.    X Corp. breached the TOS by filing a lawsuit against Plaintiffs "related to . . . the Services" in the Northern District of Texas. *See* Ex. E.

128.    TAP breached the TOS by filing a lawsuit against Media Matters "related to . . . the Services" in Singapore. *See* Ex. C.

129.    TIUC breached the TOS by filing a lawsuit against Media Matters "related to . . . the Services" in Ireland. *See* Ex. B.

130.    Plaintiffs have suffered damages as a result of X Corp.'s breach of contract. Plaintiffs have been forced to expend millions of dollars in attorneys' fees and costs defending X Corp.'s improperly filed suit in Texas.

## COUNT II

**Breach of Contract– Against X Corp., TIUC, and TAP (International Litigation)**

131.    Plaintiffs incorporate all allegations set forth in this complaint, *supra*.

132.    The X Terms of Service ("TOS") is a valid and enforceable contract that X has in other contexts sought to enforce. Plaintiffs performed under the contract: they have used the account that generated the content depicted in the November 16 article in compliance with the terms set forth in the TOS, which is attached as Exhibit A.

133.    The TOS contains a forum selection clause stating, "All disputes related to these Terms or the Services will be brought solely in the federal or state courts located in San Francisco

County, California, United States, and you consent to personal jurisdiction and waive any objection as to inconvenient forum." Ex. A at 10.

134.    Defendants are each bound by the TOS. X Corp. is a signatory, and TAP and TIUC are bound as third party beneficiaries, alter egos of X Corp., and as parties closely related to the contractual relationship.

135.    TAP breached the TOS by filing a lawsuit against Media Matters "related to . . . the Services" in Singapore. *See* Ex. C.

136.    TIUC breached the TOS by filing a lawsuit against Media Matters "related to . . . the Services" in Ireland. *See* Ex. B.

137.    Upon information and belief, X Corp. breached the TOS by directing TAP and TIUC to file their respective lawsuits against Media Matters, which are "related to . . . the Services," in courts outside of San Francisco County. Upon information and belief, the lawsuits filed by TAP and TIUC are part of a multi-national litigation campaign motivated by X Corp. chairman Elon Musk's vendetta against Media Matters.

138.    Plaintiffs have suffered damages as a result of Defendants' breaches of contract. Plaintiffs have been forced to expend millions of dollars in attorneys' fees and costs defending TIUC and TAP's separate lawsuits in two additional jurisdictions on two additional continents— neither of which house the forum Plaintiffs agreed to.

## COUNT III

### Declaratory Judgment related to the International Actions, 28 U.S.C. § 2201(a)

139.    Plaintiffs incorporate all allegations set forth in this complaint, *supra*.

140.    Defendants have filed multiple international suits against Media Matters, in each instance asserting allegations premised on the same single course of conduct by Plaintiffs. Specifically, TIUC has filed suit in Ireland, TAP has filed suit in Singapore, and, on information and belief, X Corp. directed the filing of both suits.

141.    The conduct alleged in these international lawsuits—that Plaintiffs allegedly manipulated the X Platform in an effort to generate specific content/advertisement pairings and

then reported on the results of that use—relates to the "Services" provided by X (as defined in the TOS) and Defendants were accordingly bound by the forum selection clause in the TOS.

142.    Despite being required to file their respective lawsuits in San Francisco County, California, Defendants instead filed their suits in different jurisdictions, including in Ireland and Singapore.

143.    An actual and imminent controversy exists between the parties over whether the forum selection clause in the TOS governs the claims asserted in Defendants' Irish and Singapore litigation.

144.    Declaratory judgement that the forum selection clause in the TOS governs the international cases filed by Defendants against Media Matters will resolve a substantial dispute between the parties.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs requests that the Court enter an order or judgment against Defendants including the following:

(a) Damages against Defendants for their breaches of contract;

(b) Declaratory judgment that the claims asserted by TIUC and TAP in their respective actions against Media Matters are governed by the forum selection clause in X's Terms of Service designating courts in San Francisco County, California, as the proper venue;

(c) Injunctive relief enjoining Defendants from further prosecuting their pending actions against Media Matters in Ireland and Singapore jurisdictions; and enjoining X Corp., whether directly or through its subsidiaries, from prosecuting or initiating litigation against Media Matters arising from the same conduct alleged in the pending Ireland and Singapore complaints in jurisdictions outside of the United States; and

(d) All other relief to which Plaintiffs may be entitled at law or in equity.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

**SUSMAN GODFREY L.L.P.**

1

Dated: March 10, 2025

By: _/s/ Katherine M. Peaslee_

2

3

JUSTIN A. NELSON (TX SBN 24034766)*
MATTHEW BEHNCKE (TX SBN 24069355)*
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
jnelson@susmangodfrey.com
mbehncke@susmangodfrey.com

4

5

6

7

8

KATHERINE M. PEASLEE (CA SBN 310298)
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
kpeaslee@susmangodfrey.com

9

10

11

12

AMANDA BONN (CA SBN 270891)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
abonn@susmangodfrey.com

13

14

15

16

17

AMER S. AHMED (NY SBN  4382040)*
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Email: aahmed@gibsondunn.com

18

19

20

21

*_pro hac vice_ forthcoming

22

_Attorneys for Plaintiffs Media Matters for
America, Angelo Carusone, and Eric Hananoki_

23

24

25

26

27

28

COMPLAINT - 39