JUSTIN A. NELSON (TX SBN 24034766)*
jnelson@susmangodfrey.com
MATT BEHNCKE (TX SBN 24069355)*
mbehncke@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
*pro hac vice

KATHERINE M. PEASLEE (CA SBN 310298)
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
kpeaslee@susmangodfrey.com

AMANDA BONN (CA SBN 270891)
abonn@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

Attorneys for Plaintiff Media Matters for America
(Additional parties and counsel listed with signature)

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, ANGELO CARUSONE, and ERIC HANANOKI<br><br>     Plaintiffs,<br><br>vs.<br><br>X CORP., TWITTER INTERNATIONAL UNLIMITED CO., and TWITTER ASIA PACIFIC PTE. LTD.<br><br>    Defendants. | Case No. 3:25-cv-02397-VC<br><br>**PLAINTIFFS' NOTICE OF MOTION FOR A PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Date:  April 17, 2025 (*request to shorten forthcoming*)<br>Time: 10:00 AM<br>Place: Courtroom 4 – 17th Floor<br>     450 Golden Gate Avenue,<br>     San Francisco, CA 94102 |

## TABLE OF CONTENTS

NOTICE OF MOTION ………..……………………………………………………..1

I.      INTRODUCTION .................................................................................................. 1

II.     ISSUES TO BE DECIDED ................................................................................... 3

III.    STATEMENT OF RELEVANT FACTS .............................................................. 3

        A.     Hate speech rises on X after Musk's takeover and advertisers flee........................ 3

        B.     Media Matters joins the media conversation regarding extremism on X. .............. 4

        C.     X Corp. initiates a retaliatory litigation campaign against Media
               Matters. ................................................................................................................. 5

        D.     X's foreign actions repeat the same allegations as X Corp's Texas
               Complaint. ............................................................................................................. 8

        E.     Media Matters reporter Hananoki agreed to the X Terms of Service. .................. 10

        F.     The Terms of Service expressly benefit X affiliates and related
               companies............................................................................................................. 10

IV.     LEGAL STANDARD.......................................................................................... 11

V.      ARGUMENT ...................................................................................................... 12

        A.     The issues and parties here are the same as in the foreign cases ......................... 12

               1.     A valid forum selection clause exists in the TOS. ................................... 13

               2.     The issues fall under the forum selection clause...................................... 13

               3.     All of the parties in the foreign action fall under the forum
                      selection clause. ...................................................................................... 16

        B.     Maintaining litigation outside this Court would frustrate this forum's
               policy, be vexatious and oppressive, and prejudice Media Matters...................... 22

        C.     The injunction's impact on comity is tolerable.................................................... 25

VI.     CONCLUSION ................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Applied Med. Distribution Corp. v. Surgical Co. BV*,
   587 F.3d 909 (9th Cir. 2009)..................................................................................*passim*

*Brittain v. Twitter Inc.*,
   2019 WL 110967 (D. Ariz. Jan. 4, 2019) ............................................................. 13

*Burse v. Purdue Pharma Co.*,
   2004 WL 1125055 (N.D. Cal. May 3, 2004) ........................................................ 24

*E. & J. Gallo Winery v. Andina Licores S.A.*,
   446 F.3d 984 (9th Cir. 2006)..................................................................................*passim*

*Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*,
   328 F.3d 1122 (9th Cir. 2003)....................................................................... 18, 20

*Harris v. Cnty. of Orange*,
   682 F.3d 1126 (9th Cir. 2012)............................................................................. 18

*JH Portfolio Debt Equities, LLC v. Garnet Cap. Advisors, LLC*,
   2018 WL 6112695 (C.D. Cal. Mar. 16, 2018) .................................................... 17

*Lewis v. Liberty Mut. Ins. Co.*,
   321 F. Supp. 3d 1076 (N.D. Cal. 2018), *aff'd*, 953 F.3d 1160 (9th Cir. 2020)...................... 13

*Lockheed Martin Corp. v. Aceworld Holdings Pty Ltd.*,
   No. 5:19-cv-04074-EJD, 2019 WL 3767553 (N.D. Cal. Aug. 9, 2019) ......................... 12, 24

*Manetti-Farrow, Inc. v. Gucci Am. Inc.*,
   858 F.2d 509 (9th Cir. 1988)......................................................................... 13, 21

*Mazal Group, LLC v. Barak*,
   2019 WL 4316244 (C.D. Cal. June 17, 2019) .................................................... 18

*Mediterranean Enters., Inc. v. Ssangyong Corp.*,
   708 F.2d 1458 (9th Cir. 1983).............................................................................. 13

*Microsoft Corp. v. Motorola, Inc.*,
   696 F.3d 872 (9th Cir. 2012)...................................................................... 2, 11, 22

*Perry v. AT&T Mobility LLC*,
   No. C 11–01488 SI, 2011 WL 4080625 (N.D. Cal. Sept. 12, 2011) ............................. 13, 14

*Philadelphia Indem. Ins. Co. v. SMG Holdings, Inc.*,
   44 Cal. App. 5th 834 (2019) ............................................................................... 20

*Pirozzi v. Fiserv Corp.*,
    668 F. Supp. 3d 968 (C.D. Cal. 2022) ...................................................................... 16

*Republic of the Philippines v. Marcos*,
    862 F.2d 1355 (9th Cir. 1988).................................................................................. 12

*Robles v. Schneider National Carriers, Inc.*,
    2017 WL 8232083 (C.D. Cal. Dec. 11, 2017) ........................................................ 14

*Scott USA Inc. v. Patregnani*,
    2015 WL 1736496 (D. Idaho Apr. 16, 2015)........................................................... 21

*TAAG Linhas Aereas de Angola v. Transamerica Airlines, Inc.*,
    915 F.2d 1351 (9th Cir. 1990) ................................................................................. 20

*Trans-Tec Asia v. M/V HARMONY CONTAINER*,
    435 F. Supp. 2d 1015 (C.D. Cal. 2005), *aff'd*, 518 F.3d 1120 (9th Cir. 2008)...................... 20

*Trump v. Twitter, Inc.*,
    2021 WL 8202673 (S.D. Fla Oct. 26, 2021) ................................................... 13, 16

*Trump v. Twitter, Inc.*,
    21-cv-22441 (S.D. Fla.) .......................................................................................... 16

*In re Untersweser Reederei GMBH*,
    428 F.2d 888 (5th Cir. 1970).................................................................................... 11

*White Knight Yacht LLC v. Certain Lloyds at Lloyd's London*,
    407 F. Supp. 3d 931 (S.D. Cal. 2019) ............................................................... 16, 20

*X Corp. v. Center for Countering Digital Hate*,
    No. 23-cv-03836 (N.D. Cal.) ..................................................................................... 5

*X Corp. v. Ctr. for Countering Digital Hate, Inc.*,
    724 F. Supp. 3d 948 (N.D. Cal. 2024) ..................................................................... 23

*X Corp. v. Media Matters for America et al.*,
    No. 4:23-cv-1175 (N.D. Tex) ................................................................................ 6, 17

**Statutes**

28 U.S.C. § 1404 .............................................................................................................. 1

28 U.S.C. § 1406 .............................................................................................................. 1

**Rules**

Fed. R. Civ. P. 65(a)......................................................................................................... 1

**Constitional Provisions**

U.S. Const. amend. I. ...................................................................................................... 24

**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**

PLEASE TAKE NOTICE that on April 17, 2025,[1] at 10:00 AM, before the Honorable Vince Chhabria, Plaintiffs Media Matters for America, Angelo Carusone, and Eric Hananoki (together, "Plaintiffs") move under Federal Rule of Civil Procedure 65(a) for an order granting a preliminary injunction against Defendants X Corp., Twitter International Unlimited Co. ("TIUC"), and Twitter Asia Pacific Pte. Ltd. ("TAP") (together, "X" or "Defendants"). The Motion is based on this Notice of Motion and Motion, the supporting Memorandum, the pleadings and papers on file in this action, arguments of counsel, and any other matter that the Court may properly consider.

Media Matters respectfully requests the Court enter a preliminary injunction (1) enjoining Defendants from further prosecuting their pending actions against Media Matters in jurisdictions outside the United States, and (2) enjoining X Corp., whether directly or through its subsidiaries, from prosecuting or initiating litigation against Media Matters arising from the same conduct alleged in the Ireland and Singapore complaints in jurisdictions outside of the United States.

**MEMORANDUM AND POINTS OF AUTHORITIES**

**I.      INTRODUCTION**

X has filed three lawsuits against Media Matters—in Texas, Ireland, and Singapore—and has threatened a fourth, each premised on the *exact same conduct*: Media Matters' use of the X Platform in a way that X calls "inorganic" and "contrived," and Media Matters' subsequent reporting on that use. X's worldwide litigation campaign is harassing and retaliatory. It is also a breach of contract. The Terms of Service governing Media Matters' use of the X Platform require that "All disputes related to these Terms or the Services" be litigated in San Francisco County, California. Ex. 1 at 10.[2] Plaintiffs thus seeks injunctive relief to vindicate the forum selection clause and ensure that any foreign litigation arising from the same conduct proceeds in the proper forum.[3]

While X's cases in Ireland and Singapore were nominally filed by Twitter International

---

[1] Plaintiffs intend to promptly file a motion to shorten, requesting a hearing date of April 10, 2025, in order to set the hearing of this motion in advance of an April 14 hearing in Singapore.

[2] Cited exhibits are attached to the Declaration of K. Peaslee, concurrently filed herewith.

[3] Media Matters' present motion does not seek injunctive relief with regard to the pending Texas litigation. Rather, Plaintiffs have filed a motion pursuant to 28 U.S.C. §§ 1404 and 1406 in that matter to transfer venue to the Northern District of California. That motion is currently pending.

Unlimited Co. ("TIUC") and Twitter Asia Pacific Pte. Ltd. ("TAP"), respectively, statements from X Corp.'s chairman Elon Musk and the nearly identical nature of those suits to X Corp.'s prior suit filed in the Northern District of Texas underscore that those international cases were filed at the direction of X Corp. Accordingly, Media Matters seeks a preliminary injunction barring not only TIUC and TAP, but also X Corp., from maintaining litigation against Media Matters in foreign jurisdictions in violation of the Terms of Service and from initiating any new suits based on the same alleged conduct in foreign jurisdictions.

The Ninth Circuit has held that an anti-suit injunction is appropriate in the face of a valid forum selection clause. *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984 (9th Cir. 2006). The factors considered by courts in this circuit when issuing an anti-suit injunction against foreign litigation all weigh in favor of relief for Media Matters.

*First*, the case before this Court is dispositive of the issues in the foreign litigation and all parties to the foreign litigation are parties here. The Ninth Circuit has explained that the issues and parties need not be identical across foreign and local cases where the local case is "dispositive" of the foreign one. Rather, the relevant inquiry is whether the issues and parties in the foreign litigation are subject to a forum selection clause, rendering the foreign suit improperly filed. *Applied Med. Distribution Corp. v. Surgical Co. BV*, 587 F.3d 909, 915 (9th Cir. 2009). That is the case here.

*Second*, Media Matters can satisfy three of the so-called *Unterweser* considerations, any **one** of which is sufficient for the second prong of *Gallo*. *See Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 881 (9th Cir. 2012). An anti-suit injunction is appropriate because United States policy favors enforcing forum selection clauses between private parties, the foreign litigation is vexatious and oppressive to Media Matters, and Media Matters is prejudiced by the foreign litigation. Any one of those factors is sufficient.

*Third*, as the Ninth Circuit has held, comity is not implicated when private parties are subject to a forum selection clause. *Applied Med. Distrib.*, 587 F.3d. at 914.

Media Matters is harmed on an ongoing basis by being required to defend itself on multiple fronts around the world. It respectfully requests that this Court grant preliminary injunctive relief.

## II.    ISSUES TO BE DECIDED

Whether this Court should grant a preliminary injunction (1) barring X Corp., TIUC, and TAP from prosecuting their pending international litigation against Media Matters; and (2) barring X Corp. from initiating or directing further international litigation, directly or through its subsidiaries, arising from the same alleged conduct.

## III.    STATEMENT OF RELEVANT FACTS

### A.  Hate speech rises on X after Musk's takeover and advertisers flee.

Elon Musk purchased X—then known as Twitter—in October 2022. Almost immediately, Musk began laying off key executives and content moderators at X responsible for removing hate speech and violent rhetoric. Ex. 2 at 4; Ex. 3 at 1. As part of the many changes Musk brought to the platform, Musk eliminated a number of existing products and policies designed to protect users from misinformation and violent content under the guise of promoting "free speech." Ex. 2 at 4. He also reinstated suspended accounts of known white supremacists and conspiracy theorists. *Id*.

The dismantling of much of X's content moderation infrastructure had an unsurprising effect: Extremist and racist rhetoric surged on X. Less than a month into Musk's ownership, the Brookings Institute reported that the platform had seen a "surge in hateful language" in the wake of Musk's purchase, including "a nearly 500% increase in use of the N-word in the 12-hour window immediately following the shift of ownership to Musk." Ex. 3 at 1. Academic researchers at Montclair State University published a report describing how "Hate Speech Spike[d] on Twitter After Elon Musk Acquire[d] the Platform." Ex. 4 at 1. *The New York Times* likewise reported on the rise of hate speech on X following Musk's takeover. *See* Ex. 5.

The spike in hateful rhetoric on X caught the attention of companies that advertise on the platform, who understandably do not want to create an association between their brands and such content. Advertisers began to stop advertising on the platform in the months after Musk took over: CNN reported that since "the early days of Musk's takeover, many of Twitter's largest advertisers—including the likes of General Mills and the Volkswagen Group—paused their spending over concerns about X's layoffs, content moderation capabilities and general uncertainty about the platform's future." Ex. 2 at 5–6; *see also* Ex. 6.

In addition to X's abandonment of some of its prior content moderation efforts, advertisements began appearing alongside this flood of hateful and violent rhetoric—potentially creating exactly the perceived association between their brands and hate speech that advertisers hope to avoid. Indeed, media outlets including *The Washington Post*, *Ars Technica*, *The Verge*, *Business Insider*, *The New York Post*, and others have reported on the platform's failure to protect advertisers from having their brands appear next to extremist, hateful, and violent rhetoric. *See* Exs. 7–11, 16, 35. This led to a broader exodus of advertisers from the platform—and a significant drop in its revenue. In July 2023, CNN reported that, according to Musk, X had a "50% decline in ad revenue and heavy debt load." Ex. 2 at 6. In September, Musk reportedly stated that advertising revenue in the U.S. was "still down 60%." *Id*.

In August 2023, X's CEO Linda Yacccarino addressed the advertiser exodus and declining ad revenue, stating that X had taken action to protect advertisers: She assured advertisers that brands are now "protected from the risk of being next to" potentially toxic content. Ex. 12 at 4.

### B. Media Matters joins the national conversation regarding extremism on X.

Plaintiff Media Matters for America ("Media Matters") is a not-for-profit research center and media watchdog dedicated to comprehensively monitoring, analyzing, and correcting misinformation in the media.  Ex. 13 (Carusone Decl.), ¶2. Plaintiff Angelo Carusone is President of Media Matters, and Plaintiff Eric Hananoki is a Senior Investigative Reporter. *Id*.; Ex. 14 (Hananoki Decl.), ¶2. Media Matters routinely covers both content appearing on social media and issues related to internet "brand safety"—that is, advertisers' protections from having their ads appear next to objectionable content on the internet. Ex. 13, ¶2.

As part of this coverage, Media Matters participated in the national conversation over the rise of hate speech on X and the platform's continued placement of advertisements alongside such content. Reporter Hananoki used an existing X research account that was solely for his work for Media Matters—and which he had created for research well before Musk's takeover—to follow white supremacist content and to see what advertising, if any, X's algorithm would place alongside that content. Ex. 14, ¶¶6–7. His research confirmed that the platform's system was continuing to permit advertisements next to violent and fringe content—as demonstrated in his reporting. Ex. 15.

On November 15, 2023, Musk responded to a user's post on X endorsing a conspiracy theory about Jewish communities with the comment, "You have said the actual truth." Peaslee Decl. ¶3. His post—which he later said "might be literally the worst and dumbest post I've ever done," Ex. 17 at 1—faced backlash from advertisers. *Id.*; Ex. 18 at 3 (Disney CEO on pulling ads from X).

The next day, November 16, 2023, Media Matters published an article by Hananoki entitled "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content." Ex. 15. The article included screenshots of advertisements from these companies appearing alongside pro-Nazi content. *Id.* The article subhead explained that "CEO Linda Yaccarino previously claimed that brands are 'protected from the risk of being next to' toxic posts." *Id.* The article does not claim that X was intentionally placing advertisements next to extremist or hateful content. Rather it reports truthfully, as illustrated by accurate screenshots set forth in the article, that the X platform permitted the placement of advertisements from large companies next to posts that touted Hitler or the Nazi party. This was newsworthy because X was claiming publicly that X's safety features would protect brands from having this occur. *See id.*; Ex. 12 at 3–7.

**C. X Corp. initiates a retaliatory litigation campaign against Media Matters.**

While numerous news outlets had reported on advertisers' exodus from the X Platform in response to rising hate speech, insufficient content moderation, and Musk's own conduct, *supra* pp.3–4, Musk sought to blame anyone else for the platform's declining ad revenue. Musk threatened to sue the Anti-Defamation League ("ADL") for supposedly driving away advertisers when the ADL criticized X as platforming antisemitism. *See* Peaslee Decl., ¶4. His company, X Corp., filed a lawsuit against the Center for Countering Digital Hate ("CCDH") seeking lost advertising revenue after—like Media Matters—CCDH dared publish the results of its research on the X Platform showing a rise in hate speech. *X Corp. v. Center for Countering Digital Hate*, No. 23-cv-03836 (N.D. Cal.). And, of course, Musk sought to blame X's declining revenue on Media Matters.

On November 18, Musk posted on X a promise to file "a thermonuclear lawsuit against Media Matters" in response to the November 16 article. Peaslee Decl., ¶5. His post attached a list

of "facts" about the November 16 article and accused Media Matters of manipulating X's algorithm to artificially force the placement of ads next to extremist content. *Id*.

On Monday, November 20, 2023, X Corp. made good on Musk's promise: It filed a lawsuit against Media Matters and Hananoki in federal court in the Northern District of Texas, alleging claims for Interference with Contract, Business Disparagement, and Interference with Prospective Economic Advantage. *X Corp. v. Media Matters for America et al*., No. 4:23-cv-1175 (N.D. Tex), Dkt. 1. X Corp. later amended to add Carusone as a defendant. *Id*., Dkt. 37.

X Corp.'s lawsuit alleges that Media Matters "knowingly and maliciously manufactured side-by-side images depicting advertisers' posts on X Corp.'s social media platform beside Neo-Nazi and white-nationalist fringe content," and that Media Matters "designed" these images as part of a "media strategy to drive advertisers from the platform and destroy X Corp." Ex. 19 (Texas Complaint), ¶7. According to X Corp., this activity formed part of an ideological crusade on behalf of Media Matters and its President, Carusone. *Id*. ¶34. The Complaint does not, however, deny that the content/advertisement pairings are real pairings that X placed on the Media Matters account's feed. Instead, the complaint claims that in order to generate the advertisement-content pairings upon which Media Matters reported, Media Matters "created utterly extraordinary and manufactured circumstances that no organic user would undertake" and "deliberately misused the X platform to induce the algorithm to pair racist content with popular advertisers' brands" in order to mislead readers. *Id*. ¶8. According to X Corp., Media Matters' supposed "manipulation" of the platform, and its truthful reporting on its results, "harmed X Corp.'s business relationships and advertising contracts with numerous companies." *Id*.

The Complaint breaks down the manner in which Media Matters purportedly "manufactured" circumstances that "induce[d] the algorithm" to create objectionable pairings, *id.*:

*First*, X Corp. alleges that "Media Matters set out on their attempt to evade X's content filters for new users by specifically using an account that had been in existence for more than thirty days." *Id*. ¶51.

*Second*, it alleges that "Media Matters set its account to follow only 30 users," all of which "were either already known for posting controversial content or were accounts for X's advertisers."

*Id.* ¶52. This "attempt to flood the Media Matters account with content only from national brands and fringe figures" "trick[ed] the algorithm into thinking Media Matters wanted to view both hateful content and content from large advertisers." *Id.*

*Third*, X Corp. alleges that Media Matters began to "alter its scrolling and refreshing activities in an attempt to manipulate inorganic combinations of advertisements and content." *Id.* ¶53. According to X Corp., this "generated between 13 and 15 times more advertisements per hour than would be seen by a typical user, attempting to forcibly generate a pairing of fringe content and paid advertisements." *Id.*

The complaint admits that, after Hananoki allegedly followed these steps, X Corp.'s algorithm returned the advertisement-content pairings featured in the November 16 article. *Id.* ¶54.

Musk made no secret of the fact that X Corp.'s suit was just the start of a retaliatory campaign against Media Matters. When a user on X posted that "X Corp. has filed a lawsuit against Media Matters," Musk responded, "The first of many." Peaslee Decl., ¶6. At an X Townhall on December 10, 2023, he told his audience,

> Media Matters is an evil propaganda machine. . . . ***We are suing them in every country that they operate***. And we will pursue not just the organization, but anyone funding that organization. I want to be clear about that. Anyone funding that organization, we will pursue them. So Media Matters is an evil propaganda machine. They can go to hell. I hope they do.

Ex. 20 at 1–2.

Once again, Musk was not making empty threats. Just three days prior, on December 7, 2023, X Corp.'s subsidiary in the EU and UK, Twitter International Unlimited Company ("TIUC") served a summons on Media Matters in Ireland alleging the same supposed "manipulation" of the X Platform and seeking to hold Media Matters liable for lost advertising revenue. *See* Ex. 21. That same day, X Corp.'s subsidiary in the Asia Pacific region, Twitter Asia Pacific Pte. Ltd. ("TAP") had threatened to file effectively the same suit—which it subsequently did, in July 2024. *See* Exs. 22–23 (TAP Demand and Complaint). And nine days after Musk's promise of worldwide litigation, Twitter UK ("TUK") sent Media Matters a demand letter threatening to file yet ***another*** instance of the same lawsuit. Ex. 24 (TUK Demand). TUK's letter claimed, as part of its recitation of the same conduct set forth in X's Texas Complaint, that Media Matters "deliberately, and in breach of

X's Platform Manipulation and Spam Policy, bypassed numerous safeguards that have been put in place in order to generate the content it sought in furtherance of its aims." *Id*., ¶13. The Platform Manipulation and Spam Policy is incorporated into the X Terms of Service. Ex. 1 at 8. As of the date of this filing, TUK has not filed suit.

### D.  X's foreign actions repeat the same allegations as X Corp's Texas Complaint.

The TIUC and TAP complaints each assert claims for defamation and malicious falsehood premised on Media Matters' same use of the X Platform—which TIUC claims to operate and TAP represents in their respective regions—and Media Matters' reporting on that use.

TIUC alleges that Media Matters "exploited" the features of the platform by using a "secret existing X account" to "evade normal safeguards, which manipulated the system through which posts and advertisements appear." Ex. 25, ¶12. Specifically, TIUC alleges that Media Matters:

- "[A]ttempted to evade X's content filters for new users, which excludes ads being served to newly created accounts as a safety measure, by specifically using an account that had been in existence for more than thirty days;"

- "[S]et the Secret Account to follow only 30 users (far less than the average number of accounts followed by a typical active user (219)), severely limiting the amount and type of content featured on its feed," in an "an attempt to flood the Secret Account with content only from large brands and fringe figures, tricking the algorithm into thinking that the Secret Account wanted to view both hateful content and content from large advertisers;" and

- "[A]ltered its scrolling and refreshing activities in an attempt to manipulate inorganic combinations of advertisements and content. The Secret Account's excessive scrolling and refreshing generated between 13 and 15 times more advertisements per hour than would be seen by a typical user, essentially seeking to force a situation in which a brand ad post appeared adjacent to fringe content."

*Id*. ¶¶14–15. In other words, TIUC alleges—at times verbatim—the same conduct alleged in the Texas Complaint. TIUC concedes that Media Matters' use of the platform did in fact result in the ad pairings depicted and reported on in the November 16 article. *Id*. ¶¶12, 15. TIUC seeks damages from Media Matters for lost advertising revenue that it claims resulted from the November 16 article reporting on the content generated in response to this alleged use of X's services. *Id*. ¶28, p.8.

The TAP complaint features similar allegations. Specifically, according to the TAP complaint, Media Matters "and/or" Hananoki "deliberately manufactured" the ad placements

through a "scheme" consisting of multiple steps intended to "overcome the 3-layered content moderation mechanism" that X has in place. Ex. 23, ¶¶28–29:

(a)   First, MM and/or Mr. Hananoki utilized an account that had been active for at least 30 days ("Decoy Account") to bypass the X Platform's additional advertisement filter for new users. This increased MM and/or Mr. Hananoki's chances of procuring X Group's major clients' advertisements on their feed.

(b)   Second, MM and/or Mr. Hananoki ensured that the Decoy Account exclusively followed a small subset of X Platform users falling into one of two categories: (i) those known to produce extreme, fringe content and (ii) X Group's major advertising clients. MM and/or Hananoki took this deliberate step to game the algorithm set up in the X Platform's content moderation mechanism—an algorithm that the X Group had designed to protect bona fide users of the X Platform from objectionable content. To further amplify their efforts, MM and/or Mr. Hananoki set the Decoy Account to follow only 30 users (far less than the average number of accounts followed by a typical active user, i.e., 219), thus severely limiting the amount and type of content featured on their feed.

(c)   Third, MM and/or Mr. Hananoki repeatedly scrolled and refreshed their unrepresentative, hand-selected feed, generating between 13 and 15 times more advertisements per hour than viewed by the average X Platform user.
. . .

Ex. 23, ¶29. As in both the Texas and Ireland complaints, TAP concedes that the X Platform did in fact show the Media Matters account the ad pairings featured in the article in response to the alleged use. *Id.* ¶30. The TAP Complaint asserts damages for Media Matters' reporting on the results of its use of X's platform amounting to "approximately USD 12,935,231." *Id.* ¶43.

While Twitter UK ("TUK") has not filed any suit against Media Matters, the demand letter Media Matters received from TUK recites the same conduct set out in the TIUC and TAP complaints and similarly threatened a defamation claim, based on Media Matters' supposed misuse of the platform in violation of X's Terms of Service. Ex. 24.

The parties are currently litigating Media Matters' jurisdictional challenges in the foreign actions. In Ireland, a status conference on March 12 will set the hearing schedule for that challenge. Ex. 13, ¶9. In Singapore, a hearing on the merits of the challenge is scheduled for April 14, 2025. Media Matters has consistently contested jurisdiction and venue in both Ireland and Singapore. *Id.* No discovery has taken place in the foreign actions. *Id.*

**E.  Media Matters reporter Hananoki agreed to the X Terms of Service.**

Media Matters reporter Eric Hananoki created the X account that saw the ad pairings discussed in the November 16 article in July of 2020. Ex. 14, ¶6. In doing so, he agreed to the X Terms of Service. *Id*. Hananoki used the account to conduct research on behalf of Media Matters. *Id*., ¶7. In November 2023, acting within the scope of his employment, Hananoki accessed the account to conduct research on X, Musk, and Twitter advertisers as detailed in the November 16, 2023 article. *Id*.

The Terms of Service operative in November 2023 contain a broad forum selection clause requiring parties to bring all claims related to "X's Services" in California courts:

> The laws of the State of California, excluding its choice of law provisions, will govern these Terms and any dispute that arises between you and us. ***All disputes related to these Terms or the Services will be brought solely in the federal or state courts located in San Francisco County, California***, United States, and you consent to personal jurisdiction and waive any objection as to inconvenient forum.

Ex. 1 at 10 (emphasis added). The X Terms of Service broadly defines "Services" to include any use of X products, including what X describes in its lawsuits as its platform: "These Terms of Service ('Terms') govern your access to and use of our services, including our various websites, SMS, APIs, email notifications, applications, buttons, widgets, ads, commerce services, and our other covered services . . . that link to these Terms (collectively, the 'Services')." *Id*. at 2–3.

**F.  The Terms of Service expressly benefit X affiliates and related companies.**

The X Terms of Service are between the user and X Corp. However, the TOS includes a definition of "X Entities," which is "X Corp., its parents, ***affiliates, related companies***, officers, directors, employees, agents, representatives, partners, and licensors." *Id*. at 9 (emphasis added). The TOS provides multiple benefits for the X Entities. For example, the TOS provides the following disclaimers:

> THE **X ENTITIES** DISCLAIM ALL WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT. The **X Entities** make no warranty or representation and disclaim all responsibility and liability for: (i) the completeness, accuracy, availability, timeliness, security or reliability of the Services or any Content; (ii) any harm to your computer system, loss of data, or other harm that results from your access to or use of the Services or any Content; (iii) the deletion of, or the failure to store or to transmit, any Content and other communications maintained by the Services; and (iv)

whether the Services will meet your requirements or be available on an uninterrupted, secure, or error-free basis. No advice or information, whether oral or written, obtained from the **X Entities** or through the Services, will create any warranty or representation not expressly made herein.

*Id.* (bolding added).

The TOS also provides a Limitation of Liability that benefits the X Entities: Specifically, the "X ENTITIES SHALL NOT BE LIABLE" for "ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, OR ANY LOSS OF PROFITS OR REVENUES . . . OR ANY LOSS OF DATA, USE, GOODWILL, OR OTHER INTANGIBLE LOSSES" resulting from a range of conduct. *Id.* at 10.

## IV.    LEGAL STANDARD

This Court's authority to enter an anti-suit injunction barring parties from maintaining foreign litigation derives from its "equitable powers." *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 989 (9th Cir. 2006). "The suitability of an anti-suit injunction involves different considerations from the suitability of other preliminary injunctions." *Id.* at 990. A party seeking an anti-suit injunction against a foreign proceeding "need not meet our usual test of a likelihood of success on the merits of the underlying claim." *Id.* at 991. Rather, a plaintiff "need only demonstrate that the factors specific to an anti-suit injunction weigh in favor of granting the injunction." *Id.*; *see Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 881 (9th Cir. 2012) (reaffirming that *Gallo* test replaces the usual preliminary injunction test in the context of foreign anti-suit injunctions).

The anti-suit injunction factors for a court to consider are: "(1) whether or not the parties and the issues are the same, and whether or not the first action is dispositive of the action to be enjoined; (2) whether the foreign litigation would frustrate a policy of the forum issuing the injunction [or another *Unterweser* factor applies];[4] and (3) whether the impact on comity would be tolerable." *Applied Med. Distrib. Corp. v. Surgical Co. BV*, 587 F.3d 909, 913 (9th Cir. 2009) (internal quotations omitted). Each of these considerations supports granting an injunction here.

It is within the discretion of the district court to accept hearsay evidence for purposes of

---

[4] The Fifth Circuit in *In re Untersweser Reederei GMBH*, 428 F.2d 888, 896 (5th Cir. 1970) identified a disjunctive list of considerations that may justify an anti-suit injunction against foreign litigation. *Microsoft*, 696 F.3d at 881–82. The second *Gallo* factor is satisfied if any one of the *Unterweser* considerations is met. *See id.*

deciding whether to issue a preliminary injunction. *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988).

## V.    ARGUMENT

Media Matters seeks a preliminary injunction (1) enjoining X Corp., TIUC, and TAP from further prosecuting their pending actions against Media Matters in foreign jurisdictions, and (2) enjoining X Corp., whether directly or through its subsidiaries, from prosecuting or initiating litigation against Media Matters arising from the same conduct alleged in the pending Ireland and Singapore complaints in jurisdictions outside of the United States. It is well within this Court's power to enjoin not just pending litigation but also prospective litigation in light of X Corp.'s threat of worldwide litigation, its filed cases, and the binding forum selection clause. *See, e.g.*, *Lockheed Martin Corp. v. Aceworld Holdings Pty Ltd.*, No. 5:19-cv-04074-EJD, 2019 WL 3767553, at *4 (N.D. Cal. Aug. 9, 2019) (enjoining prospective litigation because "[i]f the court does not issue an anti-suit injunction, Defendants may well bring the threatened claims against Lockheed in violation of the forum-selection clause."). Media Matters satisfies each of the *Gallo* factors considered by courts in this Circuit when ruling on a request for an anti-suit injunction.

### A.  The issues and parties here are the same as in the foreign cases.

The first step in determining whether an anti-suit injunction is appropriate is to determine "whether or not the parties and the issues are the same," and whether the action "is dispositive of the action to be enjoined." *Gallo*, 446 F.3d at 991. This is a functional inquiry, and neither the parties nor the issues need be identical. *Applied Med. Distrib.*, 587 F.3d at 914. In particular, the Ninth Circuit in *Applied Medical Distribution*, clarified that whether the issues are the same and whether one action is dispositive of the other are not separate inquiries, but are "interrelated requirements." 587 F.3d at 915. "[I]ssues are functionally the same if one action is dispositive of the other." *Id.* Thus, where a valid forum selection clause exists, "the crux of the functional inquiry in the first step of the [*Gallo*] analysis is to determine whether the issues are the same in the sense that <u>all the issues in the foreign action fall under the forum selection clause and can be resolved in the local action</u>." *Id.* (emphasis added); *Lockheed Martin Corp*, 2019 WL 3767553, at *4 (finding issues "functionally the same" within the meaning of *Gallo* even where no foreign litigation had

yet been filed because the injunction would enjoin "only claims that are subject to the forum-selection clause").

### 1. A valid forum selection clause exists in the TOS.

"Forum selection clauses are 'presumptively valid,' and 'honored' 'absent some compelling and countervailing reason.'" *Lewis v. Liberty Mut. Ins. Co*., 321 F. Supp. 3d 1076, 1079 (N.D. Cal. 2018), *aff'd*, 953 F.3d 1160 (9th Cir. 2020) (citation omitted). "The party challenging the clause bears a heavy burden of proof and must clearly show that enforcement would be unreasonable and unjust," or that the clause is invalid. *Id*. (citation omitted).

The X TOS agreed to by Hananoki and X Corp. contains a forum selection clause requiring that "All disputes related to these Terms or the Services will be brought solely in the federal or state courts located in San Francisco County, California." Ex. 1 at 10. As the sole drafter, X Corp. cannot claim that enforcing this clause would be unreasonable or unjust. Indeed, X Corp.'s predecessor, Twitter, has itself argued that the TOS form a valid contract and has successfully enforced its forum selection clause. *See, e.g.*, *Trump v. Twitter, Inc*., 2021 WL 8202673, at *3–6 (S.D. Fla Oct. 26, 2021) (granting Twitter's motion to transfer pursuant to its forum selection clause); *see also Brittain v. Twitter Inc*., 2019 WL 110967, at *4 & n.2 (D. Ariz. Jan. 4, 2019) (same). As other courts to consider these terms have done, this Court should enforce the forum selection clause as a binding agreement between the parties.

### 2. The issues fall under the forum selection clause.

Under Ninth Circuit law, a federal court sitting in diversity jurisdiction uses federal law to determine the scope of a forum selection clause. *Manetti-Farrow, Inc. v. Gucci Am. Inc.*, 858 F.2d 509, 513 (9th Cir. 1988). The terms of the forum selection clause govern its scope. *Perry v. AT&T Mobility LLC*, No. C 11–01488 SI, 2011 WL 4080625, at *4 (N.D. Cal. Sept. 12, 2011). Bringing an action that sounds in tort rather than contract is not dispositive of whether a forum selection clause governs the issue; a forum-selection clause can be "equally applicable to contractual and tort causes of action." *Manetti-Farrow*, 858 F.2d at 514.

The Ninth Circuit gives broad scope to clauses that cover disputes "relating to" a contract. *See Mediterranean Enters., Inc. v. Ssangyong Corp*., 708 F.2d 1458, 1464 (9th Cir. 1983) ("relating

to" language is broader than "arising under"). For instance, in *Robles v. Schneider National Carriers, Inc*., 2017 WL 8232083, at *3 (C.D. Cal. Dec. 11, 2017), the court found that a forum selection clause contained "broad 'relating hereto' language, which requires applying the forum-selection clause to claims beyond those just requiring the interpretation and performance of the contract." *Id.* at *3. In *Perry v. AT & T*, a party argued that the forum selection clause did not apply to her statutory claims because "the claims do not arise out of the contract, involve the interpretation of any contract terms, or otherwise require there to be a contract." 2011 WL 4080625, at *3 (citing *Narayan v. EGL, Inc*., 616 F.3d 895, 904 (9th Cir. 2010)). The court rejected that argument, stating that the Ninth Circuit had most recently explained that while forum selection clauses using the phrases "arising under," "arising out of," and "arising hereunder" should be "narrowly construed" to encompass disputes "relating to the interpretation and performance of the contract itself," the inclusion of the phrase "relating to" should lead to a "broad[er]" interpretation. *Id.* at *4 (alteration original) (quoting *Cape Flattery Ltd. v. Titan Maritime, LLC*, 647 F.3d 914, 922 (9th Cir. 2011)). That is the case here: the forum selection clause broadly applies to "All disputes ***related to*** these Terms or the Services," clearly expanding its scope beyond claims arising from the contract itself. Ex. 1 at 10 (emphasis added). The rest of the clause demonstrates that it is even broader than the typical "relating to" forum-selection clause because on its face, the forum selection clause applies not only to disputes related to the underlying contract, the "Terms"—but also applies even more expansively to disputes related to "the ***Services***." *Id*. (emphasis added).

The foreign complaints filed by TIUC and TAP make clear that their claims "relate[] to" Media Matters' use of X's services. Neither suit contests that the November 16 article accurately depicts objectionable content/advertisement pairings that occurred on X. Rather, the crux of those complaints is that Media Matters' particular use of the services was so atypical as to generate anomalous pairings that allegedly no other user would have encountered. Specifically, TIUC claims that Media Matters "manipulated" the X Platform to avoid brand safety controls. Ex. 25, ¶12. Media Matters supposedly did so by "specifically using an account that had been in existence for more than thirty days" in order to "evade X's content filters for new users"; setting its "Secret Account to follow only 30 users" consisting of either large brands or users known for extremist content,

thereby "tricking the algorithm" into thinking Media Matters wanted to see advertisements next to objectionable content; and "altered its scrolling and refreshing activities" to increase the number of advertisements displayed and "force a situation in which a brand ad post appeared adjacent to fringe content." *Id.* ¶¶14–15. In other words, TIUC's allegations rely on a particular use of X's services.

TAP likewise premises its complaint on Media Matters' use of the platform, which TAP claims was designed to "overcome the 3-layered content moderation mechanism" that X has in place. Ex. 23, ¶28–29. It alleges that Media Matters used a "Decoy Account" that had existed for at least 30 days "to bypass the X Platform's additional advertisement filter for new users"; "exclusively followed" a limited number of fringe content and major advertisers "to game the algorithm set up in the X Platform's content moderation mechanism"; and "repeatedly scrolled and refreshed their unrepresentative, hand-selected feed" in order to generate more advertisements than the average user. *Id.*, ¶29(a)–(c). Like TIUC, TAP's claims rest on Media Matters' allegedly contrived use of the X platform.

X Corp. subsidiary Twitter UK even claimed in its demand letter to Media Matters threatening litigation that Media Matters breached the X Platform's Manipulation and Spam Policy in order to "bypass[] numerous safeguards" and "generate the content it sought in furtherance of its aims." Ex. 24 at ¶13. None of the X Entities have actually claimed a breach of that policy, which is incorporated into the TOS—perhaps in an attempt to avoid the forum selection clause that would very obviously govern such a claim. But TIUC and TAP cannot avoid that their claims are related to the services provided by X Corp. and the conduct across the litigations is consistent with what the UK letter characterizes as a breach of X's Terms.

Plaintiffs intend to use their compliance with the TOS as a defense against the claims brought by the X Entities, further underscoring those claims' relation to the Services. Despite characterizing Media Matters as having sought to "evade" safeguards and "trick" the algorithm— and despite Twitter UK's claim in its demand letter that Media Matters' conduct breached "X's Platform Manipulation and Spam Policy"—none of X's filed complaints allege that Media Matters violated the TOS. It cannot be that Plaintiffs' public reporting on real content/advertisement

pairings seen by Media Matters while using X's Platform in accordance with X's own Terms of Service gives rise to tort liability.

X itself has argued in other matters that its forum selection clause is not limited to contract claims but instead applies to all claims related to use of the X platform—as it must, in light of the clause's plain language. In its motion to transfer venue from Florida to California in *Trump v. Twitter, Inc.*, 21-cv-22441 (S.D. Fla.), X argued that its forum-selection clause covered President Trump's constitutional and tort claims about his use of the X platform. *See* Ex. 26 at 10. X explained that "Courts have routinely held that disputes concerning a plaintiff's use of social media platforms are covered by forum selection clauses that cover claims 'relating to' a user agreement or use of the services more broadly, even those purporting to allege constitutional violations," and cited multiple cases in which courts enforced forum-selection clauses in cases involving tort claims related to social media platform use. *Id.* at 11–12.

The *Twitter v. Trump* court agreed with X. The court determined that all the claims fell "within the broad scope of the forum selection clause," that X's clause was mandatory, and that it was enforceable even against President Trump. *Trump v. Twitter, Inc.*, 2021 WL 8202673, at *3–6. This Court should reach the same result.

TIUC and TAP expressly premise their complaints on Media Matters' purportedly manipulative and contrived use of the X platform, and Media Matters intends to point to its compliance with the TOS as a defense. The asserted claims plainly "relate[] to. . . the Services" X provides. The issues raised in X's foreign litigation thus fall under the forum selection clause.

### 3.    All of the parties in the foreign action fall under the forum selection clause.

The X Terms of Service purport to be between the user and X Corp. Ex. 1 at 3. The direct "user" in this instance is Hananoki. Plaintiffs, however, are all able to benefit from the TOS and its forum selection clause. They are closely related to the contractual relationship. X Corp.'s subsidiaries TIUC and TAP are likewise bound.

"Forum selection clauses can be enforced by or against a non-signatory under certain circumstances," *Pirozzi v. Fiserv Corp.*, 668 F. Supp. 3d 968, 974 (C.D. Cal. 2022), including where "the non-party is 'closely related to the contractual relationship.'" *White Knight Yacht LLC*

*v. Certain Lloyds at Lloyd's London*, 407 F. Supp. 3d 931, 947 (S.D. Cal. 2019) (citation omitted); *JH Portfolio Debt Equities, LLC v. Garnet Cap. Advisors, LLC*, 2018 WL 6112695, at *5 (C.D. Cal. Mar. 16, 2018) (collecting cases for the proposition that a non-signatory party is bound by a forum selection clause when its alleged conduct is closely related to the contract).

(a) <u>Plaintiffs are bound by the TOS</u>.  Non-signatory Media Matters is "closely related" to the contractual relationship governing Hananoki's use of the X Platform. Hananoki used the X account subject to those terms in his capacity as an employee of Media Matters, in order to conduct research for Media Matters, and ultimately reported on the results of that use in an article published by Media Matters. Ex. 14, ¶¶6–7; Ex. 15. Indeed, TIUC has alleged that it was "***Media Matters***," not Hananoki personally, that "exploited" the features of its platform by using a "secret existing X account" to "evade normal safeguards, which manipulated the system through which posts and advertisements appear," Ex. 25, ¶12. TAP has attributed the same conduct to "[Media Matters] and/or Hananoki." Ex. 23, ¶29. Neither complaint names Hananoki as a defendant.

X Corp. further alleges, in the Texas Complaint upon which the TIUC and TAP complaints are patterned, that ***all*** Plaintiffs participated in and benefitted from the alleged X platform manipulation: that Hananoki authored false articles, Media Matters and its President Carusone published the articles, and that Carusone amplified the allegedly false premise of the article in a television interview—all in furtherance of their joint, ideologically driven crusade against X. Ex.19, ¶¶2, 7–13. Accordingly, all Plaintiffs are "closely related" to Hananoki's use of X's services—that is, the subject of the contractual relationship between Hananoki and X Corp.—and can enforce X's forum-selection clause. It would be nonsensical to allow X to allege claims against Media Matters and Carusone premised on Hananoki's use of the X Platform, yet hold that Media Matters and Carusone are not "closely related" to the contract governing his Hananoki's use of the X Platform.

(b) <u>Defendants are bound by the TOS</u>. As a signatory to the TOS, X Corp. is necessarily bound by those terms and its forum selection clause. Defendants TAP and TIUC are likewise bound for at least three independent reasons: (1) they are alter egos of X Corp. with respect to this suit; (2) they are third party beneficiaries of the TOS; and (3) like Media Matters, they are "closely related" to the contractual relationship governing Hananoki's use of the X Platform.

**1.**    TIUC and TAP are bound by the forum selection clause because they are, for the purposes of this suit, alter egos of X Corp. *Mazal Group, LLC v. Barak*, 2019 WL 4316244, at *2 (C.D. Cal. June 17, 2019) (non-signatory was bound by forum selection clause where the signatory and non-signatory "acted as . . . corporate alter ego[s] with respect to [the] suit"). In order to satisfy the alter ego exception to the general rule that a subsidiary and the parent are separate entities, a plaintiff must make out a *prima facie* case "(1) that there is such unity of interest and ownership that the separate personalities of the two entities no longer exist and (2) that failure to disregard their separate identities would result in fraud or injustice." *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1134–35 (9th Cir. 2003) (citations and alterations omitted). A plaintiff must show that the parent exercises such control over the subsidiary so as to "render the latter the mere instrumentality of the former." *Id*. at 1135 (citation omitted). That is the case here.

*First*, X Corp. and its foreign subsidiaries TIUC and TAP share a unity of interest and ownership. TIUC and TAP's own description of their claims and their relationship with X Corp. demonstrate the unity of interest between these companies. TIUC and TAP have asserted defamation claims against Media Matters, despite the fact that neither TIUC nor TAP is mentioned in the November 16 article. They nevertheless maintain that the article defamed them because they are "synonymous" with X and a reasonable reader would understand the article's references to "X" to refer to TIUC and TAP. Ex. 25, ¶21(ii); Ex. 23, ¶12. In other words, their claims are premised on the notion that their identities are interchangeable with "X" in Europe and the Asia Pacific regions, respectively, such that they have an identical interest in Media Matters' purportedly "manipulative" use of the X Platform and subsequent reporting on that use.

Each of TIUC and TAP are subsidiaries of X Corp., which is in turn part of X Holdings. *See* Ex. 25, ¶1; Ex. 23, ¶2. Upon information and belief, based on Twitter's most recent SEC filings prior to Musk taking the company private in 2022, TIUC and TAP's profits and losses roll up to their parent (now X Corp.). *See* Ex. 27.[5] Elon Musk is both the majority owner of X Holdings and the chairman of X Corp. and, according to numerous reports, exercises direct control over the X Entities both domestically and abroad. For instance, Musk reportedly directed the dramatic changes

---

[5] The Court "may take judicial notice of undisputed matters of public record." *Harris* v. *Cnty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012).

in staffing and content moderation that followed his 2022 takeover of the company formerly known as Twitter. Ex. 2 at 3–4. Musk personally sent an email to all staff telling them they would need to either commit to his "extremely hardcore" vision for the company or be laid off. Ex. 28. Musk's email went not only to domestic X Corp. employees, but to at least employees at TIUC as well. Ex. 29 at 1–2. Musk involves himself in individual decisions about which specific accounts to allow or suspend—including, for instance, suspending then reinstating accounts of journalists that criticized him, Ex. 30—and details like how public media accounts should be labeled, Ex. 31 at 3. And—as indicated by his personal email to international subsidiary employees—Musk's control is not limited to the domestic X entity, X Corp.: *Business Insider* reported that "Musk is closing many international Twitter offices as he continues to cut costs and try to find ways the company can make money." Ex. 32 at 1. According to a Reuters report, the Musk-directed cuts included workers in Twitter's Dublin and Singapore offices—that is, TIUC and TAP, respectively. Ex. 33 at 1–2. And, most importantly, public evidence indicates that, in his role as X Corp. chairman, Musk exercised direct control over the decision to file lawsuits against Media Matters by TIUC and TAP.

On November 18, 2023, Musk promised "thermonuclear" litigation in response to Media Matters' November 16 article. After X Corp. then filed its case against Media Matters in the Northern District of Texas, Musk proclaimed that X Corp.'s suit against Media Matters was "***[t]he first of many***." Peaslee Decl., ¶6. Less than three weeks later, Musk stated at an X Townhall that "***We*** are suing [Media Matters] in every country that they operate." Ex. 20 at 1–2 (emphasis added). He described Media Matters as an "evil propaganda machine," and in colorful terms promised to go after not only Media Matters, but also its donors. *Id.* Musk promised explosive litigation against Media Matters, and he has delivered on that promise through X Corp. in Texas and through its subsidiaries abroad. With regard to their pending suits against Media Matters, X Corp. and its subsidiaries have a complete unity of interest: all are acting at the directions of X Corp. chairman, Musk.

*Second*, failure to disregard the separate identities of X Corp. and its subsidiaries TIUC and TAP would result in injustice. Musk, through X Corp., has initiated harassing litigation against Media Matters worldwide over conduct governed by a forum selection clause that requires disputes

related to the use of X's services to be litigated in California. Allowing X Corp. to circumvent that limitation by simply directing its subsidiaries to file copycat lawsuits in foreign jurisdictions would work significant injustice on Media Matters.[6]

**2.** Non-signatories TIUC and TAP are also subject to the forum selection clause as third-party beneficiaries to the TOS. *TAAG Linhas Aereas de Angola v. Transamerica Airlines, Inc.*, 915 F.2d 1351, 1354 (9th Cir. 1990) (holding "a forum selection clause can restrict a third-party beneficiary to the designated forum."); *White Knight Yacht*, 407 F. Supp. 3d at 947 ("A forum selection clause may be enforced against a non-party . . . when the non-party is a third-party beneficiary of the contract with the clause."); *Trans-Tec Asia v. M/V HARMONY CONTAINER*, 435 F. Supp. 2d 1015, 1028 n.17 (C.D. Cal. 2005), *aff'd*, 518 F.3d 1120 (9th Cir. 2008) ("[U]nder well-established precedent a third-party beneficiary can be bound to the terms of a forum-selection clause contained in the contract to which it is a beneficiary" (collecting cases)); *see also Philadelphia Indem. Ins. Co. v. SMG Holdings, Inc*., 44 Cal. App. 5th 834, 841 (2019) ("Under the third party beneficiary theory, a nonsignatory may be compelled to arbitrate where the nonsignatory is a third party beneficiary of the contract.").

Both TIUC and TAP have a strong interest in how X users use X's services, regardless of where those users are located—as evidenced by their complaints against U.S.-based Media Matters premised on Media Matters' supposedly "manipulative" use of the platform. A U.S.-based user's posts on X can still be seen in TIUC and TAP's regions; activity that breaks the TOS when executed on the platform in the U.S. impacts the same platform that TIUC operates in Europe and that TAP represents in the Asia Pacific region. The contractual agreement between a user and X Corp. protects both TIUC and TAP, providing limitations on how a user can utilize the services that both TIUC and TAP represent.

The TOS governing Media Matters' use of the X platform expressly contemplate TIUC and TAP as beneficiaries, as they confer direct benefits on TIUC and TAP. Specifically, the TOS

---

[6] In the event the Court declines to find that the record sufficiently supports binding TIUC and TAP to the TOS, Plaintiffs respectfully request the opportunity to conduct jurisdictional discovery on this point. *See, e.g., Harris Rutsky*, 328 F.3d at 1135 (reversing district court's denial of jurisdictional discovery and remanding to allow development of the record).

contains multiple benefits for the "X Entities," which includes X Corp.'s "affiliates" and "related companies"—and as subsidiaries, TIUC and TAP qualify as both. For instance, the TOS provides that the X Entities disclaim warranties for everything from "merchantability" and "non-infringement," to "responsibility and liability" for harm to a user's computer or data, to liability for whether the Services meet a user's requirements or are available on a "secure, or error-free basis." Ex. 1 at 9. The TOS also purports to broadly limit TIUC and TAP's liability for various damages. *Id*. at 9–10. The contract's plain terms confer benefits on both TIUC and TAP.

The forum selection clause does not limit its application to only the direct signatories, but rather applies to "***All disputes*** related to these Terms or the Services." *Id*. at 10 (emphasis added). Given the benefits conferred by the contract on both TIUC and TAP and the breadth of the forum selection clause, both are bound by the forum selection clause.

**3.** Finally, both TIUC and TAP are bound under the "closely related" test. The Ninth Circuit has stated that where nonparties are closely related to the contractual relationship, "a range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses." *Manetti-Farrow*, 858 F.2d at 514 n.5. This "closely related" standard" is notably broader than the third-party beneficiary standard, *Scott USA Inc. v. Patregnani*, 2015 WL 1736496, at *3 (D. Idaho Apr. 16, 2015)—which, as addressed *supra*, TIUC and TAP also satisfy. As explained above, both entities assert claims based on Media Matters' use of the X platform, which is governed by the TOS. *Supra*, pp.14–15. And, as also explained above, both TIUC and TAP premise their respective defamation claims on the notion that they are interchangeable with X Corp. in their regions such that publicly reported "manipulative" use of the platform directly harms ***them***. *Supra*, p.18. TIUC and TAP's respective liabilities are released by the contract between Hananoki and X Corp., clearly "relating" them to the contractual relationship. Indeed, all of the facts demonstrating that TIUC and TAP are alter egos of X and are third-party beneficiaries of the agreement support finding them bound under the more lenient "closely related" test.

The parties are all subject to the forum selection clause as is necessary for this Court to issue a preliminary injunction preventing Defendants from initiating or further prosecuting foreign litigation against Media Matters over the conduct at issue in Defendants' pending suits.

**B.  Maintaining litigation outside this Court would frustrate this forum's policy, be vexatious and oppressive, and prejudice Media Matters.**

At the second *Gallo* step, the Court considers "whether at least one of the so-called '*Unterweser* factors' applies," including "[whether the] foreign litigation . . . would (1) frustrate a policy of the forum issuing the injunction; (2) be vexatious or oppressive; (3) threaten the issuing court's *in rem* or *quasi in rem* jurisdiction; or (4) where the proceedings prejudice other equitable considerations. *Microsoft*, 696 F.3d at 881–82  (alterations in original, citation omitted).  Here, Media Matters meets at least factors one, two, and four.

The Ninth Circuit has held that allowing foreign litigation that runs contrary to a valid and enforceable forum selection clause would "frustrate a policy of the forum issuing the injunction,"— the first *Unterweser* factor—and is enough to justify an anti-suit injunction. *Gallo*, 446 F.3d at 992; *see also Applied Med. Distrib.*, 587 F.3d at 919. Indeed, "[w]ithout an anti-suit injunction in this case, the forum selection clause effectively becomes a nullity." *Gallo*, 446 F.3d at 992. The United States has a strong policy favoring enforcement of forum selection clauses, satisfying the first *Unterweser* consideration and second *Gallo* factor. *Applied Med. Distrib.*, 587 F.3d at 914.

TIUC and TAP's foreign litigation against Media Matters is also "vexatious" and "oppressive," independently satisfying the second *Gallo* factor with the second *Unterweser* factor. In *Microsoft Corp. v. Motorola Inc.*, the Ninth Circuit affirmed the district court's injunction against German litigation, and held the district did not abuse its discretion by interpreting Motorola's German lawsuit as a "procedural maneuver designed to harass Microsoft." 696 F.3d at 886. The parties were already litigating a dispute involving large portfolio of patents when Motorola sued Microsoft in Germany over two of the patents in the portfolio. *Id.* The court relied on the definition of "vexatious" from *Black's Law Dictionary* as "without reasonable or probable cause or excuse; harassing; annoying," and clarified that "litigation may have some merit and still be vexatious." *Id.* Here—putting aside that X's lawsuit has no merit in the first place—the only possible interpretation of its foreign filings is that they are designed to harass Media Matters given the existing litigation in Texas over exactly the same conduct.

X's decision to file suit in multiple international forums was *designed* to make litigation

more oppressive for Media Matters. X could have filed all of its lawsuits in this Court—in fact, X's own terms of service *required* it to do so. But X breached the forum-selection clause it repeatedly enforced against parties in other litigation by filing suit in the Fort Worth Division of the Northern District of Texas—a forum with no connection to the dispute. X then directed its subsidiaries to file the two international actions in places where Media Matters does not operate and has no presence, and it has threatened a third. X's actions were designed to make the litigation oppressive for Media Matters regardless of the merits or eventual outcome. And it has works: The cost to the organization has been tremendous, both financially and operationally. Ex. 13, ¶¶5–6.

Musk's own conduct has made clear that X's serial litigation is retaliation for Media Matters' reporting in its November 16 article: from his promise of a "thermonuclear lawsuit against Media Matters," to his characterization of Media Matters as "evil" and his commitment that X Corp. would engage in serial, worldwide litigation against Media Matters and its supporters. *Supra*, p.19. In response to another X post commenting that Media Matters "f'd around [and] found out," Musk gleefully posted "Yup." Peaslee Decl., ¶7. And while Musk has promised to go after Media Matters "in every country that they operate," Media Matters only "operate[s]" in Washington, D.C.—so forcing it to defend itself in Ireland and Singapore is particularly oppressive.

This is not the first time X Corp., a multi-billion-dollar company, has sought to punish a non-profit for reporting on X in a manner X did not like. In his order dismissing X Corp.'s similar lawsuit against CCDH, Judge Breyer stated,

> Sometimes it is unclear what is driving a litigation, and only by reading between the lines of a complaint can one attempt to surmise a plaintiff's true purpose. Other times, a complaint is so unabashedly and vociferously about one thing that there can be no mistaking that purpose. This case represents the latter circumstance. This case is about punishing the Defendants for their speech."

*X Corp. v. Ctr. for Countering Digital Hate, Inc.*, 724 F. Supp. 3d 948, 955 (N.D. Cal. 2024). X Corp. has similarly sought to punish Media Matters, and it has used international suits to do so.

Finally, the fourth *Unterswear* factor—whether the proceedings prejudice other equitable considerations—weighs in favor of an anti-suit injunction. As explained above, Media Matters has suffered and continues to suffer prejudice from litigating the same facts against the same parties all over the world in separate lawsuits with different tribunals and different schedules.

The harm is ongoing. In X's Northern District of Texas suit, the parties are engaged in discovery. However, Media Matters cannot focus its attention there because it must simultaneously defend the foreign suits: In Ireland it has a status conference March 12 to schedule argument on Media Matters' objection to jurisdiction. Ex. 13, ¶9. In Singapore, Media Matters' hearing on its jurisdictional challenges is April 14, 2025—when Media Matters will likely be preparing for argument in Ireland. *See id*. A court in this District has held that forcing a party to defend itself in multiple forums across the country results in greater prejudice than subjecting a party to an inconvenient forum. *Burse v. Purdue Pharma Co.*, 2004 WL 1125055, at *2 (N.D. Cal. May 3, 2004). The prejudice to Media Matters is yet greater—it is defending itself all over the ***world***.

Meanwhile, the requested relief will not prejudice TIUC or TAP. A preliminary injunction "merely enforces the forum-selection clause and will not deprive [the X Entities] of legal recourse." *Lockheed Martin Corp.*, 2019 WL 3767553, at *4. And Media Matters has represented in the foreign actions that it would not oppose TIUC and TAP joining X's U.S. litigation, nor would Media Matters object on venue or statute of limitations grounds to TIUC and TAP refiling their claims in this District. Ex. 13, ¶8.

Allowing Media Matters to face potential multi-national liability for truthful reporting that was researched, drafted, and published from the United States, and which discusses the practices a company incorporated and headquartered in the United States, implicates important First Amendment concerns. The chilling effect of the mere existence of X Corp.'s suits is tremendous: No media organization wants to risk the prospect of being targeted by the richest man in the world and the company he directs, particularly not if it means being targeted around the world. X's multiple lawsuits have certainly chilled Media Matters' own reporting. Ex. 13, ¶5; Ex. 14, ¶8–12. They have forced Media Matters' personnel to spend time supporting litigation rather than performing their normal roles. Ex. 13, ¶5. And Musk's online comments have made Media Matters the target of threats and harassment from strangers, Ex. 13, ¶4; Ex. 14, ¶9. The ongoing international suits only increase the chances of further threats in light of Musk's high profile and media coverage of litigation related to his companies.

**C. An injunction's impact on comity is tolerable.**

Where the other *Gallo* factors are met, a court should enjoin foreign proceedings if the impact on comity is "tolerable." Here, there is no impact at all: "where private parties have previously agreed to litigate their disputes in a certain forum, one party's filing first in a different forum would not implicate comity at all." *Applied Med. Distrib.*, 587 F.3d. at 914.

The fact that the foreign cases were filed before this action "makes no difference as to the propriety of an anti-suit injunction." *Gallo*, 446 F.3d at 994. To the contrary, giving the first-filed suit deference in the face of a forum selection clause would incentivize a party seeking to evade the forum to rush to file suit in a foreign jurisdiction and undermine the United States' sound policy favoring forum selection clauses. *Id.*

The court in *Gallo* paid special attention to the "messy, protracted, and potentially fraudulent" nature of the foreign suits at issue in affirming the district court's injunction. *Gallo*, 446 F.3d at 995. Here, too, the foreign litigation is messy and retaliatory, particularly in light of Musk's public comments vowing to sue Media Matters in as many jurisdictions as possible and "hop[ing] they do" "go to hell." *See* Ex. 20 at 1–2. Demonstrating such extreme facts is not necessary to conclude an injunction's impact is tolerable, but these facts "tilt[] the balance 'even further in favor of granting an injunction.'" *Applied Med. Distrib.*, 587 F.3d at 922 (quoting *Gallo*, 446 F.3d at 993).

**VI.    CONCLUSION**

Media Matters respectfully requests the Court enter a preliminary injunction (1) enjoining X Corp, TIUC, and TAP from further prosecuting their pending actions against Media Matters in foreign jurisdictions, and (2) enjoining X Corp. from prosecuting or initiating litigation against Media Matters., whether directly or through its subsidiaries, arising from the same conduct as that alleged in the pending Ireland and Singapore complaints in jurisdictions outside of the United States in violation of the X Terms of Service's forum selection clause.

Dated: March 11, 2025                          **SUSMAN GODFREY L.L.P.**

                                               By:    */s/ Justin A Nelson*
                                               _____
                                               JUSTIN A. NELSON (TX SBN 24034766)*

MATT BEHNCKE (TX SBN 24069355)*
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
jnelson@susmangodfrey.com
mbehncke@susmangodfrey.com

KATHERINE M. PEASLEE (CA SBN 310298)
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
kpeaslee@susmangodfrey.com

AMANDA BONN (CA SBN 270891)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
abonn@susmangodfrey.com

AMER S. AHMED (NY SBN  4382040)**
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Email: aahmed@gibsondunn.com

*pro hac vice
**pro hac vice forthcoming

Attorneys for Plaintiffs Media Matters for
America, Angelo Carusone, and Eric Hananoki

<u>**CERTIFICATE OF SERVICE**</u>

I, Katherine M. Peaslee, pursuant to 28 U.S.C. § 1746, declare as follows:

       1.  On March 11, 2025, Plaintiffs are serving the filed, ECF-stamped copy of the foregoing Plaintiffs' Motion for a Preliminary Injunction, along with the attached declaration and exhibits, on the following counsel of record for X Corp. in *X Corp. v. Media Matters et al.*, 4:23-cv-01175-O (N.D. Tex.) via email:

John Clay Sullivan
S|L Law PLLC
Email: john.sullivan@the-sl-lawfirm.com

Alexander Mark Dvorscak
Stone Hilton PLLC
Email: alex@stonehilton.com

Ari Cuenin
Stone Hilton PLLC
Email: ari@stonehilton.com

Christopher D Hilton
Stone Hilton PLLC
Email: chris@stonehilton.com

Cody C Coll
Stone Hilton PLLC
Email: cody@stonehilton.com

Elizabeth Joan Brown Fore
Stone Hilton PLLC
Email: elizabeth@stonehilton.com

Judd E Stone , II
Stone Hilton, PLLC
Email: judd@stonehilton.com

Michael Abrams
Stone Hilton PLLC
Email: michael@stonehilton.com

2.  Plaintiffs are serving paper copies of the ECF-stamped copy of the foregoing Plaintiffs' Motion for a Preliminary Injunction, along with the attached declaration and exhibits, via process server on Defendants at the following addresses:

X Corp.
c/o CT Corporation Systems
330 N. Brand Blvd, Suite #700
Glendale, CA 91203

Twitter International Unlimited Co.
c/o X Corp.
c/o CT Corporation Systems
330 N. Brand Blvd, Suite #700
Glendale, CA 91203

Twitter Asia Pacific Pte. Ltd.
c/o X Corp.
c/o CT Corporation Systems
330 N. Brand Blvd, Suite #700
Glendale, CA 91203

Executed on this 11th day of March 2025, in San Francisco, California.

*/s/Katherine M. Peaslee*
Katherine M. Peaslee (CA SBN 310298)